UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
In re                                                          :
                                                               :
FKF 3, LLC,                                                    :
                                                               :
                              Debtor.                          :
----------------------------------------------------------------------x
ARISTON PROPERTIES, LLC and CONRAD           :          **OPINION AND ORDER**
RONCATI,                                      :
                                             :
                              Appellants,     :          13 CIV. 3310 (ER)
                                             :
        - against -                          :
                                             :
GREGORY MESSER, as Trustee of the FKF Trust, :
                                             :
                              Appellee.       :
----------------------------------------------------------------------x

Ramos, D.J.:

    Ariston Properties, LLC ("Ariston") and Conrad Roncati ("Roncati")

(collectively, "Appellants") appeal from the Order dated March 21, 2013 granting default

judgments against Appellants, entered by Chief United States Bankruptcy Judge Cecelia

G. Morris (Bankr. Doc. 47).[1]   For the reasons set forth below, the Order of the

Bankruptcy Court is VACATED, and the case is REMANDED to Judge Morris for

further proceedings consistent with this Opinion and Order.

I.   **Factual Background**

    On July 19, 2010, three creditors filed an involuntary Chapter 11 petition against

FKF 3, LLC ("Debtor" or "FKF 3") in the United States Bankruptcy Court for the

Southern District of New York.   Declaration of Romain D. Walker, Esq. ("Walker

Decl.") (Doc. 19), Ex. B (March 13, 2013 Memorandum Decision Granting Default

---

[1] References to "Bankr. Doc." refer to documents filed in the underlying adversary proceeding, *Messer v. GMR, LLC, et al.*, Adv. Pro. No. 12-09072 (Bankr. S.D.N.Y. 2012).  References to "Doc." refer to documents filed in the instant appeal.

Judgments) ("Memorandum Decision") at 2. The Debtor consented to the order for relief and the Bankruptcy Court entered it on August 9, 2010. *Id.* On April 18, 2011, the Bankruptcy Court confirmed the Joint Plan of Liquidation of FKF 3, pursuant to which the FKF Trust ("Trust") was created and Gregory Messer was appointed trustee ("Trustee" or "Appellee"). *Id.*

On July 18, 2012, the Trustee commenced the underlying adversary proceeding against the Appellants, among others, by filing a complaint with the Bankruptcy Court (the "Complaint"). Bankr. Doc. 1 ("Compl."). The Complaint alleges that on April 21, 2006, defendant GMR, LLC ("GMR") issued an Amended and Restated Promissory Note to the Debtor in the amount of $1,500,000 (the "Note"), evidencing a loan made by the Debtor to GMR and its principal, defendant Gary M. Ricci ("Ricci").[2] Compl. ¶ 27. The loan was to be used by GMR in the development of a real property project in Edgewater, New Jersey, in which Ricci and Roncati were partners (the "Project").[3] *Id.* ¶ 30.

Contemporaneously with the execution of the Note, both Ricci and Roncati executed Guarantees of GMR's obligation under the Note. *Id.* ¶ 33. Pursuant to the Guarantees, Ricci and Roncati "jointly and severally, absolutely, irrevocably and unconditionally guarantee[d] to [Debtor] the full, prompt and unconditional payment of the [Loan]." *Id.* ¶ 34; *see also* Declaration of Conrad J. Roncati ("Roncati Decl.") (Doc. 18), Ex. B (Guaranty) ¶ 2. Additionally, Roncati and Ricci each pledged their

---

[2] The Complaint does not indicate whether there was a prior Note and, if so, what its terms and conditions were.

[3] Although the loan was to be used by Ricci and Roncati in the development of the Project, neither Ricci nor Roncati are parties to the Note. Rather, GMR is the sole "Borrower" under the Note.

membership interests in Ariston[4] and GMR, respectively, to the Debtor as additional security for GMR's obligations under the Note.  Compl. ¶ 35; *see also* Roncati Decl., Ex. C (Ariston Pledge and Security Agreement).

In or around August 2006, Ricci informed the Debtor in writing that he was transferring his interest in the Project and that Roncati would be taking over responsibility for the Loan.  Compl. ¶ 36.  Ricci simultaneously requested a return of his $350,000 Cash Collateral, less the interest due on the Note through December 31, 2006 and the Debtor's legal fees in connection with the change.  *Id.*  On August 8, 2006, the Debtor returned $150,000 of the Cash Collateral to Ricci, and on September 2, 2006, the Debtor returned the remaining $76,583.34 of the Cash Collateral after $123,416.66 in interest and fees due on the Note through December 31, 2006 were deducted.  *Id.* ¶ 37. The Trustee alleges that other than the deductions to the Cash Collateral, no interest, fees or principal payments were ever made on the Note.  *Id.* ¶ 38.

On November 10, 2010, the Debtor sent a demand to Roncati and GMR demanding the repayment of the Note.  *Id.* ¶ 40.  On December 3, 2010, Roncati responded to the Debtor's correspondence through his counsel, claiming that the Debtor released Roncati pursuant to an August 11, 2006 agreement (the "Release").  *Id.* ¶ 41. The Release provided, among other things, as follows:  (i) the release of GMR from its obligations under the Note; (ii) the release of Ricci and Roncati from their obligations under the Guarantees; and (iii) the assumption of GMR's obligations under the Note by Ariston.  *Id.* ¶ 42.  The Trustee alleged in the Complaint that the Release was never

---

[4] Roncati is the sole member and owner of 100% of the equity interest in Ariston.  Roncati Decl., Ex. C at Recitals C, D.

signed by the Debtor and is unenforceable for at least that reason.[5]  *Id.* ¶ 83.

The Complaint states claims against Appellants for breach of contract based upon Appellants' alleged breach of the Note and the Guarantees, *id.* ¶¶ 43-53, and for turnover of property of the estate pursuant to 11 U.S.C. § 542(b) for the amounts due under the Note.  *Id.* ¶¶ 54-64.  Moreover, in the event that the Bankruptcy Court finds that the Release "constitutes a valid release of GMR's, Ricci's and/or Roncati's obligations under the Note, Guarantees and related agreements," *id.* ¶ 83, the Complaint states a claim for fraudulent conveyance as an alternative to the breach of contract and turnover of property claims.  *Id.* ¶¶ 66-90.  Specifically, the Trustee alleges that the Release was an avoidable transfer because, among other things, the Debtor received less than fair consideration in exchange for the release of Appellants.  *Id.* ¶ 87.

## II.    The Underlying Adversary Proceeding

On July 23, 2012, a summons was issued by the Bankruptcy Court with respect to the Complaint.  Bankr. Doc. 2.  On July 24, 2012, the Trustee served the summons upon all defendants.  Bankr. Doc. 3.  The deadline to answer or otherwise respond to the Complaint was August 22, 2012, however, no answer or response was filed on that date. Memorandum Decision at 3.  Accordingly, the Trustee filed a request for entry of default against all defendants, which the Clerk of Court entered on September 6, 2012.  *Id.*

On September 5, 2012, the Trustee requested that another summons be issued.  *Id.* The new summons (the "Second Summons") was issued by the Clerk's Office, and on September 10, 2012, GMR, Ricci, Ariston and Roncati were re-served at different addresses.  *Id.* at 3-4.  Again, none of the defendants timely responded to the Second

---

[5] In his objection to the motion for default judgment, discussed *infra*, Ricci attached a copy of the Release signed by Mitchell Klein on behalf of FKF.  *See* Reply Mem. L. Mot for Default (Bankr. Doc. 35) ¶ 27.

Summons and Complaint by the October 9, 2012 deadline.  *Id.* at 4.  Thereafter, the Trustee requested that a second default be entered against GMR, Ricci, Ariston and Roncati.  *Id.*  In response, the Clerk's office advised the Trustee that the defaults previously entered against defendants were valid and that the entry of additional defaults was unnecessary.  *Id.*

On November 15, 2012, the Trustee filed a Motion for Default Judgment, which was served upon all defendants at all addresses previously utilized by the Trustee for service.  *Id.*  None of the defendants filed a response to the motion by the December 10, 2012 deadline.  *Id.*  On December 21, 2012, Ricci filed an objection, and on December 26, 2012, Roncati filed an objection on behalf of himself and Ariston.  *Id.*  As the clerk entered defaults against Appellants pursuant to Fed. R. Civ. P. 55(a),[6] the Bankruptcy Court treated Appellants' objection as a motion to vacate entry of default pursuant to Fed. R. Civ. P. 55(c), which states that "[t]he court may set aside an entry of default for good cause."  *Id.* at 4-5.

After a hearing on January 8, 2013, the Bankruptcy Court issued the Memorandum Decision on March 13, 2013, Bankr. Doc. 46, and an Order Directing the Entry of Default Judgments Against Defendants on March 21, 2013 ("Default Judgment Order"), Bankr. Doc. 47.  Thereafter, on April 8, 2013, the Bankruptcy Court issued an Order denying Appellants' motion for reargument, Bankr. Doc. 54, and on April 19, 2013, the Bankruptcy Court issued an Order denying Appellants' motion for a stay pending appeal pursuant to Fed. R. Bankr. P. 8005, Bankr. Doc. 61.

---

[6] Federal Rule of Civil Procedure 55 is made applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7055.

**III.     Appellants did Not Impliedly Consent to the Entry of a Final Order by the Bankruptcy Court**

The Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Bankruptcy Act") divided proceedings related to a bankruptcy into "core" and "non-core," giving final adjudicative power to the bankruptcy court in the former, but not the latter case. *See* 28 U.S.C. § 157; *see also In re Coudert Bros. LLP*, No. 11-2785 (CM), 2011 WL 5593147, at *10 (S.D.N.Y. Sept. 23, 2011).   Section 157 also provides, however, that a bankruptcy court may finally adjudicate a non-core matter if the parties consent to such adjudication. *In re Coudert Bros. LLP*, 2011 WL 5593147, at *10.   The core/non-core division in the 1984 Bankruptcy Act was intended to move final adjudicative authority over proceedings involving "public rights" to the Article I bankruptcy courts, while retaining matters not at the "core" of the Congressionally-created right to a bankruptcy discharge (i.e., claims involving "private rights") to the Article III courts for final determination. *Id* at *5.   Congress tried to delineate the "core" of the public right to a bankruptcy discharge by listing examples of claims that it believed the bankruptcy courts could finally adjudicate in the statute. *Id.*   In *Stern v. Marshall*, 131 S. Ct. 2594 (2011), however, the Supreme Court held that "Congress did not altogether succeed in its goal:  some claims, though denominated 'core' under the statute, nevertheless involve only private rights, which preclude the Bankruptcy Court from finally adjudicating them." *In re Coudert Bros. LLP*, 2011 WL 5593147, at *6.   The *Stern* decision thus "demonstrates that the constitutional question is not congruent with the text of the bankruptcy statute," and that in determining whether the bankruptcy court has authority to make final adjudications, courts must consider whether the claims to be adjudicated involve "public" or "private" rights, and not simply whether the claims were

delineated by Congress as "core" in the statute. *Id.* at *7. If the claims involve "private" rights, the bankruptcy court does not have final adjudicative power over the claims. *Id.*

Here, Appellee appears to concede that the claims in the adversary Complaint involve "private" rights. Indeed, Appellee's entire argument with respect to the adjudicative authority of the Bankruptcy Court centers on whether Appellants "impliedly consented" to entry of the default judgment by the Bankruptcy Court. *See* Appellee's Mem. L. Opp. (Doc. 25) 19-21. Accordingly, as the parties agree that the claims at issue are not within the adjudicative authority of the Bankruptcy Court,[7] the preliminary issue before this Court is whether Appellants consented to the Bankruptcy Court's final adjudication of the claims. If Appellants did consent, the appeal should proceed under 28 U.S.C. § 158(a)(1), which gives the Court power to hear appeals from "final" orders. *See In re Coudert Bros. LLP*, 2011 WL 5593147, at *10. If Appellants did not consent to final adjudication by the Bankruptcy Court, however, then the Default Judgment Order should be vacated, and Judge Morris's "final" determinations in the Memorandum Decision treated as recommendations under § 157(c)(1) and reviewed *de novo* by this Court.[8] *Id.*

Appellee concedes—and a review of the record confirms—that Appellants did not

---

[7] Although it need not reach the issue in light of Appellee's failure to raise it, the Court nevertheless finds that the breach of contract and fraudulent conveyance claims do, in fact, involve "private" rights which the bankruptcy judge may not finally adjudicate absent consent of the parties. *See Adelphia Recovery Trust v. FLP Grp., Inc.*, No. 11 Civ. 6847 (PAC), 2012 WL 264180, at *3-*4 (S.D.N.Y. Jan. 30, 2012) (holding that Supreme Court precedents demonstrate that a fraudulent conveyance claim involves a private right and citing cases holding same); *In re Charter Commc'ns*, 409 B.R. 649, 655-56 (Bankr. S.D.N.Y. 2009) (noting that where an adversary proceeding relates to asserted breaches of a prepetition agreement, that factor weighs against a finding of "core" status).

[8] 28 U.S.C. § 157(c)(1) states: "A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected."

expressly consent to the Bankruptcy Court's entry of a final order on Appellee's claims. Rather, Appellee argues that Appellants "impliedly consented to entry of a final order by a bankruptcy judge by failing to respond to the properly served summons and complaint." Appellee's Mem. L. Opp. Mot. to Stay (Doc. 23) 19.   In support of its argument, Appellee cites to *In re Oldco M. Corp.*, 484 B.R. 598 (Bankr. S.D.N.Y. 2012).   In that case, the bankruptcy court held that

> Where a summons and complaint have been properly served and the defendant has failed to respond . . . the defendant's actions, or lack thereof . . . constitute implied consent to the entry of a default judgment by a bankruptcy judge.   The answer is the same whether the claims asserted in the adversary complaint are core, non-core, or core but for which only an Article III judge may enter a final order or judgment consistent with the U.S. Constitution absent consent.

*Id.* at 614.

Here, Appellants failed to respond to the Complaint.   However, they filed an opposition to the Trustee's motion for default judgment and appeared at the hearing on the motion.   Moreover, although Appellants did not raise the issue of the Bankruptcy Court's adjudicative authority in their opposition to the motion for default judgment, they did raise the argument to the Bankruptcy Court in their motion for reargument.[9]   *See* Mot. for Reargument (Bankr. Doc. 53) 14-15.   The defendant in *Oldco M. Corp.*, on the other hand, did not file a response to the complaint *or* the Trustee's motion for default judgment *or* appear at the hearing on the motion.   *Oldco M. Corp.*, 484 B.R. at 600-01. Accordingly, based on the narrow facts of the case, the bankruptcy court in *Oldco M.*

---

[9] The Bankruptcy Court denied Appellants' motion for reargument on the basis that they "failed to meet their burden under Rule 59 and Local Rule 9023-1 of demonstrating an 'intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" Order Denying Motion for Reargument (Bankr. Doc. 54) 2.

*Corp.* made clear that it was not deciding "whether or when a bankruptcy judge may order entry of a final default judgment *other than* as a result of a defendant's failure to respond to the adversary complaint." *Id.* at 601 n.3 (emphasis added). Indeed, in deciding the issue, the bankruptcy court reviewed recent post-*Stern* decisions of district courts within this Circuit which recognize that implied consent continues to be a "proper basis for upholding the exercise of authority of a bankruptcy judge to enter a final order or judgment," but that "implied consent *should not be easily found*." *Id.* at 606, 609 (emphasis added). Accordingly, as Appellants appeared in the adversary proceeding and ultimately raised the issue of the Bankruptcy Court's authority to issue the default judgments during the course of that proceeding, the Court finds that the *Oldco M. Corp.* decision is distinguishable from the facts at issue here.

Prior to *Stern*, courts in this Circuit "routinely found that parties could and did consent implicitly to the exercise of final jurisdiction by the Bankruptcy Court even with respect to non-core matters." *See In re Coudert Bros. LLP*, 2011 WL 5593147, at *10 (citing cases). Although the Supreme Court in *Stern* confirmed that consent can be a sufficient basis for final adjudication by a bankruptcy court, *id.* (citing *Stern*, 131 S. Ct. at 2608), this Court has held that "[f]ollowing *Stern*, it is doubtful whether mere participation in litigation is enough to imply consent." *Id.* at *12. Accordingly, in light of the directive from the Second Circuit that "a court should not lightly infer from a litigant's conduct consent to have private state-created rights adjudicated by a non-Article III bankruptcy judge," *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1138 (2d Cir. 1987), the court in *In re Lyondell Chem. Co.*, 467 B.R. 712 (S.D.N.Y. 2012), a post-*Stern* decision, held that the defendants did not impliedly consent to final adjudication by the

9

bankruptcy court by participating in proceedings before the bankruptcy court without objection for over a year. *Id.* at 722. Similarly, in *In re Madison Bentley Assocs., LLC*, 474 B.R. 430 (S.D.N.Y. 2012), the court noted that "[t]he test for consent is strict" and, accordingly, held that defendants did not consent to final adjudication by the bankruptcy court by litigating the adversary proceeding for over a year and a half. *Id.* at 436-37, 439-40 (noting that "a waiver of important rights should only be found where it is fully knowing") (internal quotations marks and citation omitted); *see also In re Arbco Capital Mgmt., LLP*, 479 B.R. 254, 266-67 (S.D.N.Y. 2012) (holding that defendant did not consent to the bankruptcy court's jurisdiction to enter a final order where defendant "participated in two 'hearings' before the Bankruptcy Court without raising any objection to its jurisdiction").

In determining implied consent, courts typically consider whether the objection to the bankruptcy court's authority is raised before or after any trial activities have occurred or a judgment has been entered, with the latter weighing in favor of a finding of implied consent. *See, e.g. In re Lyondell Chem. Co.*, 467 B.R. at 722; *In re Madison Bentley Assocs., LLC*, 474 B.R. at 439. Although in this case, Appellants first raised the issue of the Bankruptcy Court's adjudicative authority *after* the default judgments had been entered against them, the Court nevertheless finds that Appellants did not impliedly consent to the Bankruptcy Court's final adjudication of the Trustee's claims. Most litigants who have been found by courts within this Circuit to have impliedly consented to final adjudication by the bankruptcy judge failed to object during any of the "extensive proceedings" before the bankruptcy court or in their appeal of the bankruptcy court's final order or judgment to the district court. *See, e.g., In re Men's Sportswear, Inc.*, 834

F.2d at 1137-38 (holding that defendant impliedly consented to the bankruptcy court's final adjudication of the matter where defendant failed to object to the bankruptcy judge's assumption of "core jurisdiction" at any point during the "extensive proceedings before the bankruptcy court" and also "fail[ed] to object to any part of the appeal process in the district court"); *Dev. Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP*, 462 B.R. 457, 472 (S.D.N.Y. 2011) ("Where a party participates in *extensive litigation* without raising an argument of which it was aware, it would be unfair and inefficient to allow that party to escape the consequences of its knowing silence.") (emphasis added); *In re Tyson*, 433 B.R. 68, 76-77 (S.D.N.Y. 2010) (holding that defendants impliedly consented to bankruptcy court's final adjudication of claims where defendants did not object before or during trial or during post-trial motion practice in the bankruptcy court).   Here, Appellants did not participate in "extensive proceedings" before raising the issue of the Bankruptcy Court's authority to issue a final judgment.   Rather, Appellants raised the issue in their motion for reconsideration after their first and only appearance before the Bankruptcy Court, as well as before this Court on their appeal.   In light of the "strict" test for a finding of consent, the Court finds that Appellants did not impliedly consent to the Bankruptcy Court's entry of the default judgments at issue.   Accordingly, the Default Judgment Order is vacated, and Judge Morris's findings in the Memorandum Decision are treated as recommendations under § 157(c)(1) and reviewed *de novo* by this Court.

## IV.   Applicable Law

In determining whether there is "good cause" to vacate an entry of default under Fed. R. Civ. P. 55(c), courts in this Circuit apply a three-factor test:   (1) whether the default was willful; (2) whether the defendant demonstrates the existence of a meritorious

defense to the defaulted claims; and (3) whether, and to what extent, vacating the default will cause the nondefaulting party prejudice. *W.B. David & Co., Inc. v. De Beers Centenary AG*, 507 F. App'x 67, 69 (2d Cir. 2013) (citation omitted). These criteria must be applied in light of the Second Circuit's "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993); *accord Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981) (per curiam) ("[T]he extreme sanction of a default judgment [is] a weapon of last, rather than first, resort.") (citations omitted). Moreover, although the same factors are analyzed to determine whether an administrative default and a default judgment should be vacated, there is a "more forgiving standard for setting aside an administrative default," like the one at issue here.[10] *State Farm Mut. Auto. Ins. Co. v. Cohan*, 409 F. App'x 453, 456 (2d Cir. 2011).

### a. Willfulness of the Default

### 1. Appellants Were Properly Served

When service of process is mailed pursuant to Bankruptcy Rule 7004(b),[11] "[c]ourts uniformly presume that an addressee receives a properly mailed item when the sender presents proof that it properly addressed, stamped, and deposited the item in the mail." *In re Dana Corp.*, No. 06–10354 (BRL), 2007 WL 1577763, at *4 (Bankr.

---

[10] An "administrative default" refers to a default entered by the clerk of the court under Fed. R. Civ. P. 55(a) "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). An administrative default may be set aside for "good cause" shown under Rule 55(c). A default judgment, on the other hand, refers to a final judgment for a certain amount of damages entered against a defendant who has been defaulted for not appearing. Fed. R. Civ. P. 55(b). A court may set aside a default judgment under Rule 60(b) ("Grounds for Relief from a Final Judgment, Order, or Proceeding"). Fed. R. Civ. P. 55(c) ("The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)."). Because this Court has determined to treat the Bankruptcy Court's final judgment as a recommendation, the Court addresses the propriety of vacating the administrative defaults entered against Appellants.

[11] Rule 7004(b) permits service upon an individual or corporation within the United States by first class mail.

S.D.N.Y. May 30, 2007).  Although the presumption is a rebuttable one, it is "very strong" and can only be rebutted by "specific facts" and "not by a mere affidavit to the contrary."  *Id.*; *accord In re Ms. Interpret*, 222 B.R. 409, 413 (Bankr. S.D.N.Y. 1998) ("[A] party must do more than merely assert that it did not receive the mailing; its testimony or affidavit of non-receipt is insufficient, standing alone, to rebut the presumption.").

Here, the Second Summons was mailed to Roncati's business and home address. Memorandum Decision at 10.  Although Roncati admits that the addresses used were correct, with respect to the business address, he argued to the Bankruptcy Court that "the property houses several other businesses and it is not uncommon for an article of mail to be accidentally delivered to or picked up by another tenant in the building." *Id.*  With respect to the home address, Roncati asserted that "[i]f these pleadings were indeed sent to this address, assuming they arrived, the documents may have been misplaced by the person whom I have hired to perform household duties, which includes collecting the mail." *Id.*  The Bankruptcy Court found that in light of Roncati's failure to set forth "specific, objective facts to substantiate his allegations that another tenant received his mail and never returned it, or that his household staff improperly handled his mail," he failed to rebut the "very strong" presumption that proper service was effectuated.  *Id.* Appellants do not appear to contest Judge Morris's determination that proper service was effectuated or otherwise attempt to rebut the presumption of receipt.  Rather, Appellants' submissions on appeal focus on the willfulness of their default, rather than on the propriety of service.  Accordingly, in light of Appellants' failure to specifically contest the Bankruptcy Court's finding of proper service, as well as Appellants' reliance on rank

speculation and "a mere affidavit to the contrary," the Court finds that Appellants have failed to rebut the "very strong" presumption of proper service.

## 2.  Appellants' Default was Not Willful

As Appellants were properly served with the Second Summons, the question for the Court becomes whether Appellants' default was willful.  As a default judgment is an "extreme sanction," *Meehan*, 652 F.2d at 277, it should only be imposed upon a "'serious showing of willful default.'"  *Tripmasters, Inc. v. Hyatt Int'l Corp.*, No. 82 Civ. 6792 (JFK), 1984 WL 1057, at *2 (S.D.N.Y. Oct. 23, 1984) (quoting *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983)).  Accordingly, the Second Circuit has interpreted the "willfulness" factor to refer to conduct that is deliberate, rather than merely negligent or careless.  *S.E.C. v. McNulty*, 137 F.3d 732, 738 (2d Cir. 1998) (citations omitted).  On the other hand, willfulness may be found where the defaulting party "'made a conscious decision to allow a hearing to go forward without a response,'" *In re FairPoint Commc'ns*, 462 B.R. 75, 80 (Bankr. S.D.N.Y. 2012) (citation omitted), or where the conduct of counsel or the litigant was egregious and was not satisfactorily explained. *McNulty*, 137 F.3d at 738.

Courts in this District have noted that the relevant inquiry for determining willfulness is the defaulting party's actions after it became aware of the existence of the litigation or entry of default.  *See, e.g. In re Fairpoint Comm'cns, Inc.*, 462 B.R. at 81; *In re JWP Info. Servs., Inc.*, 231 B.R. 209, 212 (Bankr. S.D.N.Y. 1999) ("It is [the party's] actions after he became aware of the existence of the Trustee's motion . . . that reaches the level of wilfulness.").  Thus, even where notice was adequate and the defaulting party failed to rebut the presumption of receipt, if the party responded promptly after learning

of the action, courts have found that the party's default was not willful.  *See, e.g. In re Fairpoint Comm'cns, Inc.*, 462 B.R. at 81 (holding that defendant's default was not willful where he filed a motion for reconsideration eleven days after discovering that an order had been issued against him); *In re Journal Register Co.*, No. 09–10769 (ALG), 2010 WL 5376278, at *1, *3 (Bankr. S.D.N.Y. Dec. 23, 2010) (finding that even where claimant's delay in responding was due to her attorney tardily discovering a "previously unreviewed Claim Objection" that was in his possession, the claimant did not act willfully "because she did not have actual knowledge [of the] proceeding and promptly sought relief"); *Tripmasters, Inc.*, 1984 WL 1057, at *3 (noting that the defaulting party "moved promptly to vacate the default judgment once it discovered that the judgment had been entered"); *see also Swarna v. Al-Awadi*, 622 F.3d 123, 142-43 (2d Cir. 2010) (finding that default was not willful where defendants retained counsel one day after receiving the motion for default judgment and where counsel moved for an extension of time to respond one week later).

Here, the Bankruptcy Court based its finding of willful default on the fact that although Roncati admitted becoming aware of the action in November 2012, Appellants nevertheless failed to promptly file a motion to vacate the default "or otherwise attempt[] to rectify their defaults once they became aware of the action."  Memorandum Decision at 11-12.  Moreover, the Bankruptcy Court noted that despite being properly served with the motion for default judgment, Appellants failed to file a timely response to the motion by the December 10, 2012 deadline.  *Id.* at 12.  Rather, Appellants did not respond to the motion or otherwise appear in the case until December 26, 2012, after the objection deadline and the presentment date for the default judgment motion had run.  *Id.*

In their papers on appeal, Appellants argue that the Bankruptcy Court erred in finding that their default was willful "[g]iven Appellants' prompt action in response to the Trustee's motion for default judgment."  Appellants' Mem. L. (Doc. 22) 10.  Roncati asserts that upon becoming aware of the adversary proceeding "sometime in November 2012," he "immediately contacted [his] attorneys" who contacted the Trustee to seek an extension of time to file a response.  Certification of Conrad J. Roncati ("Roncati Cert.") (Bankr. Doc. 26-1) ¶ 8; *see also* Appellants' Mem. L. (Doc. 22) 11.  Indeed, Appellee admits that on November 28, 2012, Charles Shaw, Esq. contacted counsel for the Trustee seeking an extension of time for Appellants to respond to the motion for default judgment, and that "[t]he Trustee agreed to a reasonable extension."[12]  Affidavit of Maeghan J. McLoughlin ("McLoughlin Aff.") (Bankr. Doc. 35-1) ¶ 30.  Moreover, Appellants appeared at the January 8, 2013 hearing on the Trustee's motion for default judgment and therefore did not "allow a hearing to go forward without a response."  *In re FairPoint Commc'ns*, 462 B.R. at 80.

The Court finds that Appellants' actions, while negligent, do not rise to the level of willfulness.  Upon learning of the adversary proceeding sometime in November, Appellants should have acted more expeditiously, perhaps appearing in the Bankruptcy Court sooner than December 26—a month after learning of the matter—in light of the fact that defaults had been entered against them and the Trustee's motion for default judgment was pending.  That Appellants' actions were negligent, however, does not

---

[12] Although Appellee admits that it agreed to a "reasonable extension," neither party provides the Court with any further detail or explanation of the agreement between the parties, including how long of an extension Appellee agreed to.  Moreover, the Court's review of the record indicates that notwithstanding any agreement between the parties, Appellants failed to seek the Bankruptcy Court's approval of an extension of time to respond to the motion to default judgment or otherwise appear in the adversary proceeding until December 26, 2012.

suggest that they were sufficiently willful to justify the entry of default judgment in excess of $3 million against them.   Indeed, Roncati contends that he "immediately" contacted counsel upon learning of the proceeding and that counsel thereafter requested an extension of time to respond to the motion for default judgment, which the Trustee granted.   Moreover, there is nothing to indicate that Appellants' response some 16 days after the deadline was "unreasonable" in light of the admitted consent of Appellee for an extension.   Additionally, Appellants appeared at the hearing on the Trustee's motion for default judgment and were heard on the matter.   Thus, although Appellants would have been advised to notify the Bankruptcy Court of its intention to appear in the matter immediately upon learning of the proceeding, the Court finds that Appellants' actions were not willful.[13]

### b.  Meritorious Defense

The Second Circuit has held that "[t]o satisfy the criterion of a 'meritorious defense,' the defense need not be ultimately persuasive at this stage.   'A defense is meritorious if it is good law so as to give the fact finder some determination to make.'" *In re JWP Info. Servs., Inc.*, 231 B.R. at 213 (quoting *Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996)).   However, the defaulting party must present evidence beyond conclusory denials, and such evidence, if proven at trial, would constitute a complete defense.  *Id.* (citations omitted).

Appellants argue that the Bankruptcy Court erred in finding that the Release does

---

[13] Appellee's willfulness argument centers mostly on Roncati's actions with respect to another adversary proceeding initiated by the Trustee, *Messer v. John F. Magee, et al (In re FKF 3, LLC)*, Adv. Pro. No. 11-09074 (Bankr. S.D.N.Y. Sept. 12, 2011), in which Roncati was served with third-party discovery requests. *See* Appellee's Mem. L. Opp. (Doc. 25) 14-17.  The Court finds that Roncati's actions with respect to a separate adversary proceeding in which he is not a party is not relevant to the consideration of the willfulness of his default in the present action.

not provide a meritorious defense to the Trustee's claims.  Specifically, the Bankruptcy Court found that Paragraph 9 of the Release, which "applies specifically to Roncati . . . counters any assertion that he is free of liability."   Memorandum Decision at 16. Paragraph 9 states:

> Ratification and Reaffirmation.  Roncati hereby ratifies and reaffirms his absolute and unconditional obligations under the Loan, the Security Instrument and the other documents executed by Roncati in connection with the Loan, and represents and warrants to FKF that the Security Instrument and other loan documents are in full force . . . .

*Id.* at 16-17.  Moreover, the Bankruptcy Court found that "further evidence of Roncati's obligation to repay the loan is found in Paragraph 6," which states in part that "Roncati agrees that his obligations under the Note shall in no way be affected by the release by lender of Ricci from his obligations under the Loan . . . ."  *Id.* at 17.  Indeed, the Bankruptcy Court found that "there has been no evidence presented which indicates that Roncati was released of his obligations under the loan or security agreement," *id.,* despite the fact that Paragraph 5 includes language specifically releasing Roncati "from [his] obligations under the Guaranty."  Roncati Decl. (Doc. 18), Ex. D (Release) ¶ 5.

Roncati argues that he was neither a party nor a signatory to the Note and would therefore have no individual liability under the terms of the Note but for the Guaranty, which he was expressly released from under the terms of the Release.  Appellants' Mem. L. (Doc. 22) 4.  Specifically, Paragraph 5 provides:

> Release of Transferor Ricci and Roncati: . . . In reliance on Ricci's representations and warranties in this Agreement, Lender releases Ricci and Roncati from their obligations under the Guaranty . . . .

Roncati Decl. (Doc. 18), Ex. D (Release) ¶ 5.

With respect to the language in Paragraph 9 whereby Roncati ratified and reaffirmed his obligations under the "Loan," Roncati argues that the "Loan" is not a single document which can be interpreted to confer benefits or liability on any party, but is rather a series of related transactions governed by four primary documents, *viz.*, the Note, the Guaranty, the Security Instrument, and the Release.  *Id.* at 7-8.  Accordingly, it is erroneous to read language referencing the *Loan* as sufficient to impose liability on Roncati under the *Note*.[14]  *Id.*  Moreover, Roncati argues that the Security Agreement does not impose individual liability on him for the Loan; rather, it grants Debtor the right to an interest in Ariston as collateral security in the event of default on the Loan.  *Id.* at 5. However, to the extent that the Release is read to contain inconsistent language, Roncati argues that under New Jersey law, to which the parties to the Release agreed to be bound, *see* Roncati Decl. (Doc. 18), Ex. D (Release) ¶ 17(a), the intent of the parties should be considered in determining the rights and obligations of the respective parties. Appellants' Mem. L. (Doc. 22) 8.  In that regard, Appellants have submitted a prior draft of the Release in which additional references to Roncati's obligations under the Guaranty were stricken, thereby "evidencing the parties' clear intent to release Roncati from any obligation under the Guaranty."  Appellant's Mem. L. Mot. for Stay (Doc. 17) 6; *see also* Roncati Decl. (Doc 18), Ex. E.

Appellee makes two arguments in response.  On the one hand, he argues that the Release should be set aside, as an "examination of the Release reveals a number of issues about its validity and application."  Appellee's Mem. L. Opp. (Doc. 25) 8.  In support of

---

[14] Indeed, "Note" and "Loan" are defined differently by the Agreement.  "Loan" is defined as the loan made by FKF 3 to GMR in the original principal amount of $1,500,000.  "Note," on the other hand, refers to the Amended and Restated Promissory Note dated April 21, 2006, which evidences the Loan.  Roncati Decl. (Doc. 18), Ex. D (Release) at Recital A.

that argument, Appellee notes the inconsistency between Paragraph 5 of the agreement, which "purports to include Roncati in the release," and Paragraph 6, which contains a clear preservation of claims against Roncati under the Note.  *Id.*  Appellee argues that the Release was "apparently negotiated in the context that Ricci and GMR were leaving the Project, and Roncati and Ariston were taking over and assuming liability."  *Id.* According to Appellee, it would therefore make "theoretical sense" for Ricci and GMR to receive a release, but it would be "completely illogical" for Roncati or Ariston to be released from their obligations, "as they assumed control of the Project."  *Id.*

Appellee also argues, on the other hand, that the Court should uphold the "unambiguous" language of the Release stating that "Roncati is obligated to pay for the existing liabilities."  *Id.* at 13-14.  Appellee appears to ignore the language of the agreement releasing Roncati from liability under the Guaranty, and instead focuses on the "unambiguous" language of Paragraph 9 obligating Roncati under "the Loan, the Security Instrument and any other documents executed by Roncati in connection with the Loan." *Id.*

Finally, Appellee argues that "to the extent that there is an arguably meritorious defense that requires the submission of evidence, it is irrelevant because of Roncati's failure to submit any defense that the Release is not avoidable as a fraudulent conveyance."  *Id.* at 14.

In light of its review of the Release, as well as the other Loan documents, the Court finds that Appellants have put forth a meritorious defense.  Although the Court need not provide its interpretation of the Release as a matter of law at this stage, in light of the language in the Release expressly releasing Roncati from his obligations under the

Guaranty, it is satisfied that Appellants have met their burden of demonstrating a meritorious defense based on "good law so as to give the fact finder some determination to make." *In re JWP Info. Servs., Inc.*, 231 B.R. at 213. Indeed, Appellee himself has *admitted* that the agreement "purports to include Roncati in the release." Appellee's Mem. L. Opp. (Doc. 25) 8. Appellee essentially asks this Court to ignore the contractual language releasing Roncati from liability under the Guaranty because, according to Appellee, it would be "completely illogical" for FKF 3 to release Roncati from liability. However, it is a fundamental canon of contract interpretation that when faced with "allegedly conflicting provisions in contracts," courts are "cautioned to be slow in reaching a result which invalidates contractual provisions, but to instead strive where possible to interpret contracts in a manner which harmonizes and gives effect to all of their provisions." *In re Kara Homes, Inc.*, No. 06–19626 (MBK), 2009 WL 4250035, at *4 (Bankr. D.N.J. Nov. 20, 2009) (citation omitted). "An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Id.* (citing *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.,* 478 F.2d 556, 560 (3d Cir. 1973) ("A contract is to be considered as a whole, and, if possible, all its provisions should be given effect . . . .")))

The interpretation offered by the Appellee renders the provisions of the agreement releasing Roncati from his obligations under the Guaranty ineffective. Where there is inconsistency within a contract, it may be resolved "by giving effect to the specific provision rather than to the general language." *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1212 (3d Cir. 1976); *accord Aramony v. United Way of Am.*, 254 F.3d 403, 413-14 (2d Cir. 2001) ("[S]pecific words will limit the

meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.") (quoting 11 Richard A. Lord, *Williston on Contracts* § 32:10, at 449 (4th ed. 1999)).  Accordingly, although the Court declines to decide the issue at this stage, it notes that the apparent inconsistency between the terms of the Release, as acknowledged by both parties, may be resolved by comparing the inconsistent provisions and considering them in the context of the entire agreement to determine which of the inconsistent provisions contains more specific language or wording, or whether the provisions may in some sense be harmonized.

Finally, although recitals in a contract cannot grant rights extending beyond those particularly described in the agreement, they may be useful in construing the rights and obligations created by the agreement.  *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103-04 (2d Cir. 1985) (citing *Genovese Drug Stores, Inc. v. Ct. Packing Co., Inc.*, 732 F.2d 286, 291 (2d Cir. 1984) ("[A]n expression of intent in a 'whereas' clause of an agreement . . . may be useful as an aid in construing the rights and obligations created by the agreement, but it cannot create any right beyond those arising from the operative terms of the document.")).  Here, the recitals state that "Lender has been asked to consent to . . . the release of Roncati from his obligations under the Guaranty," Recital D, and that "Lender has agreed to consent . . . to release Ricci and Roncati from their obligations under the Guaranty," Recital E.  Despite the clear wording of the recitals, neither the parties nor the Bankruptcy Court analyzed the effect of the recitals on the rights and obligations of the parties in light of the inconsistencies in the contract as a whole.

The Court's finding that Appellants have offered a meritorious defense is

bolstered by its review of the transcript of the January 8, 2013 hearing before the Bankruptcy Court.[15]   At that hearing, both parties' arguments centered, not on the Trustee's breach of contract claim, but rather, on the Trustee's fraudulent conveyance claim.  The Trustee reiterated his argument that the Release should be deemed ineffective because there are "a number of issues" with it, Tr. at 28, but that even if the Release "actually has some meaning and is a real document," Appellants still do not have a meritorious defense because the Release is a fraudulent conveyance, as FKF 3 received no consideration in exchange for its release of Roncati.   Tr. at 30.   In response, Appellants argued that the issue of what consideration was given to FKF 3 for Roncati's release is a "factual question" that must be decided by the ultimate finder of fact and cannot be determined by the face of the document.  Tr. at 39.  Appellants then suggested that a possible explanation for Roncati's release is that "FKF requested that Roncati take over Mr. Ricci's duties and the management of the project," and that "FKF may have felt that it was worth the release of Mr. Roncati to have him as an architect to take over the project."  Tr. at 39.

The Court finds that Appellants have offered a meritorious defense with respect to the fraudulent conveyance claim.  Appellants' defense need not be "ultimately persuasive at this stage," and the issue of what consideration, if any, FKF 3 received in exchange for the release of Roncati's obligations under the Guaranty is a factual question on which Appellants should be permitted to offer testimony.[16]   Moreover, to the extent that the

---

[15] A copy of the transcript is attached hereto as Exhibit A.

[16] Although the Release appears to impose liability on Ariston for GMR's obligations under the Note, *see* Roncati Decl. (Doc. 18), Ex. D (Release) ¶¶ 1, 4, in light of Appellee's arguments as to the "validity and application" of the Release, as well as the Court's finding that Appellants have offered a meritorious defense to the fraudulent conveyance claim, the Court finds that the default judgment against Ariston should likewise be vacated.

Trustee suggests that the Release is somehow invalid or fraudulent, that determination cannot be made by the Court at this stage of the litigation.

### c.  Prejudice to Appellees

With respect to the prejudice prong of the "good cause" test, Appellants argued below that the Trustee had only suffered a short delay as a result of their default and that the Trustee would suffer no prejudice if the defaults were vacated.  Appellants' Opp. to Mot. for Default (Bankr. Doc. 26) 6.  Appellee argued, on the other hand, that although delay alone is not sufficient to establish prejudice, a showing that the delay may "thwart plaintiff's recovery or remedy" is sufficient.  Appellee's Reply Mem. L. Mot. for Default (Bankr. Doc. 35) 18 (citing *New York v. Green*, 420 F.3d 99, 110 (2d Cir. 2005)).  The Bankruptcy Court found that in light of the Trustee's allegation that Appellants owe $1.5 million, plus interest, accruing at 20% per annum, "the delay due to the Defendants' failure to respond increases the risk that [the Trustee] will not be able to recover," and that this "increased risk of recovery is sufficient prejudice to the Trustee."  Memorandum Decision at 14.  In Appellants' submissions to this Court in support of their motion to stay, Roncati emphasizes his inability to satisfy the default judgment in light of his current financial situation.  *See* Roncati Decl. (Doc. 18) ¶¶ 8-25.  In short, the Trustee alleged below that he is entitled to recover more every day from Appellants, who may be unable to satisfy the full damages already sought.  Accordingly, the Court finds that delay, by increasing the recovery by an alleged $821.92 a day, increases the risk of its being thwarted.[17]  *See Saleh v. Francesco*, No. 11 Civ. 438 (PKC), 2011 WL 5513375, at

---

[17] The Court notes, however, that Appellee's argument that the Trust suffers prejudice every day the recovery is delayed is substantially weakened by the fact that the adversary proceeding was not instituted for almost 2 years after demand was first made on Roncati and 15 months after the Trustee was first appointed.

*5 (S.D.N.Y. Nov. 10, 2011); *see also* Appellee's Reply Mem. L. Mot. for Default (Bankr. Doc. 35) 18.

## V.    Balancing of Factors

In addition to the three factors that must be weighed on a Rule 55(c) motion, a court considering whether to relieve a party from an entry of default may also consider "[o]ther relevant equitable factors," including whether the default would produce a harsh result. *Enron Oil Corp.,* 10 F.3d at 96. The default judgments entered against Appellants are for a total of over $3 million. The Court is mindful that default judgments are disfavored and are "particularly disfavored . . . when substantial sums of money are demanded." *Id.* at 97 (citations omitted). Accordingly, the size of the default judgments here weigh in favor of vacatur.

Although the delay caused by vacating the default judgments against Appellants prejudices Appellee, the Court is mindful that in light of the "oft-stated preference for resolving disputes on the merits," *Enron Oil Corp.,* 10 F.3d at 95, doubts "should be resolved in favor of the defaulting party." *Id.* at 96 (internal quotation marks and citation omitted). Accordingly, weighing the relevant factors and equitable considerations, the Court finds that the weight of the factors tips in favor of vacatur, particularly in light of a delay of only 16 days, which arguably were within the period of the "reasonable extension" that Appellee agreed to extend to Appellants.

## VI.    Conclusion

For the reasons set forth above, the Bankruptcy Court's Default Judgment Order is vacated. Bankr. Doc. 47. Additionally, the administrative defaults and the default judgments entered against Roncati and Ariston are also vacated. Bankr. Docs. 10, 15, 48,

49.  The matter is remanded to the Bankruptcy Court for further proceedings consistent with this Opinion and Order.  The Clerk of the Court is respectfully directed to docket this decision and close the case.

Moreover, as the Court's opinion renders Appellant's Motion to Stay moot, the Clerk of the Court is respectfully directed to terminate the motion.  Doc. 16.

It is SO ORDERED.

Dated:     November 6, 2013
           New York, New York

                                             _____
                                             Edgardo Ramos, U.S.D.J.

26

# Exhibit A

```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3    ------------------------------X
                                   :
4    IN RE:                        :    10-37170 (CGM)
                                   :
5    FKF 3, LLC, and 89 BROADWAY   :    355 Main Street
       PARK RIDGE, LLC,            :    Poughkeepsie, New York
6                                  :
                       Debtors.    :    January 8, 2013
7    ------------------------------X
                                   :
8    GREGORY MESSER, as Trustee of the :
       FKF Trust,                  :
9                                  :
                       Plaintiff,  :
10                                 :    Adv. Pro. 11-09074
             -against-             :
11                                 :
                                   :
12   JOHN F. MAGEE, et al.,        :
                                   :
13                     Defendants. :
     ------------------------------X
14   GREGORY MESSER, as Trustee of the :
       FKF Trust,                  :
15                                 :
                       Plaintiff,  :
16                                 :    Adv. Pro. 12-09063
             -against-             :
17                                 :
     99 ROLAND STREET, PARK RIDGE, LLC, :
18     et al.,                     :
                                   :
19                     Defendants. :
     ------------------------------X
20   NCP REALTY, LLC, et al.,      :
                                   :
21                     Plaintiffs, :
                                   :    Adv. Pro. 12-09104
22           -against-             :
                                   :
23   KLEIN, et al.,                :
                                   :
24                     Defendants. :
     ------------------------------X
25
                             (Continued on next page.)


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
 1                                                                    2

 2

 3    ---------------------------------X
      MESSER, as Trustee of the FKF      :
 4       Trust,                          :
                                         :
 5                     Plaintiff,        :
                                         :   Adv. Pro. 12-09076
 6          -against-                    :
                                         :
 7    MULLIGAN,                          :
                                         :
 8                     Defendant.        :
      ---------------------------------X
 9    MESSER, as Trustee of the FKF      :
         Trust,                          :
10                                       :
                       Plaintiff,        :
11                                       :   Adv. Pro. 12-09081
            -against-                    :
12                                       :
      HIRSCH,                            :
13                                       :
                       Defendant.        :
14    ---------------------------------X
      MESSER, as Trustee of the FKF      :
15       Trust,                          :
                                         :
16                     Plaintiff,        :
                                         :
17          -against-                    :   Adv. Pro. 12-09077
                                         :
18    ORITANI SAVINGS BANK,              :
                                         :
19                     Defendant.        :
      ---------------------------------X
20    MESSER, as Trustee of the FKF      :
         Trust,                          :
21                                       :
                       Plaintiff,        :
22                                       :
            -against-                    :
23                                       :   Adv. Pro. 12-09067
      CALLAGHAN,                         :
24                                       :
                       Defendant.        :
25    ---------------------------------X
                               (Continued on next page.)
```

```
 1                                                                        3

 2

 3                    TRANSCRIPT OF STATUS CONFERENCE
                   BEFORE THE HONORABLE CECILIA G. MORRIS
 4                  UNITED STATES CHIEF BANKRUPTCY JUDGE

 5    APPEARANCES:

 6    For Gregory Messer,           FRED STEVENS, ESQ.
      Trustee of FKF Trust:         MAEGHAN J. MCLAUGHLIN, ESQ.
 7                                  Klestadt & Winters, LLP
                                    570 Seventh Avenue
 8                                  17th Floor
                                    New York, New York  10018
 9
      For Aventine Edgewater:       JOHN F.X. BURKE, ESQ.
10                                  210 Main Street
                                    P.O. Box 943
11                                  Goshen, New York 10924

12    For the Magee Children:       PATRICK T. BURKE, ESQ.
                                    Burke, Miele & Golden, LLP
13                                  40 Matthews Street, Suite 309
                                    PO Box 216
14                                  Goshen, New York  10024

15    For Provident Bank:           ELIZABETH ABOULAFIA, ESQ.
                                    Cullen and Dykman, LLP
16                                  100 Quentin Roosevelt Boulevard
                                    Garden City, New York 11530
17
      The FKF Trustee:              GREGORY MESSER, ESQ.
18                                  26 Court Street
                                    Suite 2400
19                                  Brooklyn, NY 11242

20
      For Christiana Glass Co.:     LEWIS WROBEL, ESQ.
21                                  201 South Avenue
                                    Suite 506
22                                  Poughkeepsie, New York 12601

23    For Argenio Bros., Inc.:      MICHAEL J. MATSLER, ESQ.
                                    Rider, Weiner & Frankel P.C.
24                                  655 Little Britain Road
                                    New Windsor, New York 12553
25

                                (Appearances continue on next page.)
```

```
 1                                                              4

 2

 3   APPEARANCES:

 4
     For Ariston Properties/      ROMAIN D. WALKER, ESQ.
 5   Conrad J. Roncati:           Law Office of Charles Shaw, P.C.
                                  170 Washington Avenue
 6                                Dumont, New Jersey 07018

 7
     For Barbara Callaghan:       SCOTT STEINBERG, ESQ.
 8                                Law Offices of Scott A.
                                     Steinberg
 9                                626 RKR Plaza, West Tower
                                  Uniondale, New York  11556
10

11   For D Bend Security          RICHARD DuVALL, ESQ.
     Systems, Inc.; Dick's        McCabe & Mack LLP
12   Concrete, JM Excavating,     63 Washington Street
     Paul Nebrasky Plumbing,      Poughkeepsie, New York 12602
13   Heating & Cooling, Pine
     Brush Equipment, Steel Belt
14   Construction, Straw Ridge
     Rock & Tape, Sullivan Fire
15   Protection:

16   For Mayer Hirsch:            BRIAN K. CONDON, ESQ.
                                  Condon & Associates
17                                55 Old Turnpike Road
                                  Suite 502
18                                Nanuet, New York  10954

19   For Oritani Bank:            RICHARD DuVALL, ESQ.
     Systems, Inc.; Dick's        McCabe & Mack LLP
20   Concrete, JM Excavating,     63 Washington Street
     Paul Nebrasky Plumbing,      Poughkeepsie, New York 12602
21   Heating & Cooling, Pine

22
     Court Transcriber:           SHARI RIEMER
23                                TypeWrite Word Processing Service
                                  211 N. Milton Road
24                                Saratoga Springs, NY 12866

25
```

5

 1              THE COURT: 10-37170, <u>FKF 3, LLC and 89 Broadway Park</u>

 2   <u>Ridge LLC</u>, Adversary Proceeding Number 11-09074, <u>Messer v.</u>

 3   <u>Magee</u>, and that's all.

 4              State your name and affiliation.

 5              MR. STEVENS: Fred Stevens, Klestadt & Winters,

 6   counsel to Gregory Messer as Trustee of the FKF Trust.

 7              THE COURT: I do understand -- now no one wants the

 8   front seat.  So you can have the front seat.  I do understand

 9   that everybody is opposing you.  So state your name and

10   affiliation.

11              MR. WALKER:  I think that's right.

12              THE COURT: Go ahead.

13              MR. WALKER:  Romain Walker, Law Office of Charles

14   Shaw on behalf of [inaudible] and Ariston Properties.

15              MR. HASPEL: Joseph Haspel on behalf of Burton

16   Dorfman.

17              MR. J.  BURKE:  John Burke on behalf of Aventine

18   Edgewater, et al., five various defendants.

19              MR. P. BURKE: Patrick Burke, Your Honor, on behalf of

20   the Magee children.

21              MR. CONDON:  Brian -- I'm sorry.

22              THE COURT: Go ahead.  We can go back.

23              MR. CONDON: Brian Condon for defendant Mayer Hirsch.

24              Good afternoon, Your Honor.  David Catuogno for

25   defendant Oritani Bank.

6

1          MS. ABOULAFIA:  Elizabeth Aboulafia for defendant

2   Provident Bank.

3          THE COURT: We got you another client somewhere.  Mr.

4   Startman [sic], go ahead.

5          MR. DuVALL:  Richard DuVall from McCabe & Mack --

6          THE COURT: I mean DuVall.

7          MR. DuVALL:  -- for a series fraudulent conveyance

8   defendants, D Bend Security Systems, Dick's Concrete, JM

9   Excavating Security, Paul Nebrasky Plumbing, Pine Brush

10  Equipment, Steel Belt Construction, Straw Ridge Rock & Tape and

11  Sullivan Fire Protection.

12         THE COURT: Congratulations.

13         MR. DuVALL: [Inaudible - laughter] numbers on my

14  side.

15         THE COURT: Mr. Wrobel.

16         MR. WROBEL:  Good afternoon, Your Honor.  Lewis

17  Wrobel for fraudulent transfer defendants, Christiana Glass.

18         MR. MATSLER: Good afternoon, Your Honor.  Mike

19  Matsler, Rider, Weiner & Frankel for defendant Argenio Bros.

20         THE COURT: Yes, ma'am.

21         MS. McLOUGHLIN:  Good morning, Your Honor.  Maeghan

22  McLoughlin for the Trustee.

23         THE COURT: I would like to tell you that it's morning

24  but it isn't.  We're already in afternoon.

25         MS. McLOUGHLIN: Sorry.

7

1          THE COURT: What do we got?  Everybody can be seated.

2   Mr. Stevens, what do we got?

3          MR. STEVENS: Your Honor --

4          THE COURT: And we have an adversary for -- we have

5   some adversary proceedings.

6          MR. STEVENS: We do, Your Honor.  The agenda starts

7   out with a matter that was actually adjourned to January 29th.

8   That is the NCP Realty matter which we'll be going forward at

9   noon on that day.  I thought the best place to start --

10          THE COURT: Page 3?

11          MR. STEVENS: Page 3 and if it's okay with Your

12   Honor --

13          THE COURT: That's my Page 2 I believe.  Okay.

14          MR. STEVENS: I think you're working with an old

15   agenda.

16          THE COURT: Then I don't have a new one.

17          MR. STEVENS: Let me give you a new one.  Ms. Gregger

18   [Ph.] has actually asked us to amend it to include the NCP

19   page.  I have copies for everybody here.

20          THE COURT: Okay.

21          MR. STEVENS: May I approach?

22          THE COURT: Certainly.

23                    [Pause in proceedings.]

24          MR. STEVENS: I thought if we started with the

25   pretrial conferences if it was okay with the Court some of the

8

1    parties here could be excused.

2          THE COURT: Okay.  Sounds good.

3          MR. STEVENS: It may be a little bit easier.  What I

4    started with were the pretrial conferences in the 23 adversary

5    proceedings that were commenced by the Trustee in July 23rd

6    which I believe is what a majority of the attorneys present

7    here are here on.  In flipping to Exhibit A, Page A1 that

8    follows the agenda where I've categorized those 23 actions and

9    I think I can sum up exactly where they are very, very quickly.

10          The first category are the two cases that are already

11    settled and resolved and will be -- American Express has

12    already had a notice of dismissal filed following an approved

13    settlement and the Otis Elevator case is just awaiting payment

14    but will be dismissed and removed from Your Honor's docket

15    very, very quickly.

16          THE COURT: Okay.

17          MR. STEVENS: The next are the four adversary

18    proceedings where there have been defaults and default

19    judgments have already been entered by the Court and those

20    matters are -- have also been resolved.

21          The third category which contains 11 separate

22    adversary proceedings is what I classified as the Jerry Self

23    Storage cases.  Those were -- Jerry Self Storage was a real

24    estate development project of the debtor's and as the

25    allegation goes the debtor's principals had over funded a loan

9

 1    to Jerry Self Storage in connection with a number of other

 2    questionable transactions which are the subject of our primary

 3    adversary proceeding against Mr. Magee, et al.  Also, the

 4    debtor directly funded payments to various recipients.

 5            THE COURT: Do we have representation of every one of

 6    these?  I can look down and skim it and see that we have on

 7    most.  Is someone here for every one of these?

 8            MR. STEVENS: Yes, Your Honor.

 9            THE COURT: Very good.  Yes, sir.  There's one person

10    that didn't put his --

11            MR. STEINBERG:  I didn't get to note my appearance,

12    Your Honor.  Scott Steinberg from the Law Offices of Scott

13    Steinberg of counsel to Alter & Brescia.  We represent

14    defendant Barbara Callaghan.

15            THE COURT: Thank you.

16            MR. STEVENS: Mr. Steinberg is in category number

17    four.

18            THE COURT: I was going to say I don't see that one in

19    this category.  The one I saw was Jan International.  Who's

20    here for Janice International and Janice Mini Storage?

21            MR. STEVENS: Your Honor, as we've been doing with all

22    these Janice cases, and I think the attorneys for the various

23    defendants will perhaps reluctantly but back me up on this,

24    have tried very hard to limit the amount of work that's been

25    done so that we can focus, have a settlement focused, a

10

1   discussion as opposed to a litigation focus point.

2       THE COURT: All right.  Thank you.  That's the only

3   one unnoted.  I saw the note but I wanted to see.

4       MR. STEVENS: Because they were out of town,

5   significantly out of town and I didn't want to make --

6       THE COURT: It's just Atlanta.

7       MR. STEVENS: I don't know anyone from there, Judge.

8   So I mean --

9       THE COURT: I know a lot.

10      MR. STEVENS: So we have -- I actually -- I said we've

11  worked out an arrangement and I had agreed they wouldn't have

12  to attend provided they put whatever costs there would be and

13  gave it to me of course.  Tongue and cheek, Your Honor.

14      THE COURT: I understand.

15      MR. STEVENS: I'm pleased to inform the Court, and

16  again it's going to be subject to getting written terms, but it

17  looks like we're very close to settlement on at least 10 of

18  these 11.  We've continued discussions that have been ongoing

19  for the last four months and we've had some decent progress in

20  the hallway.  My hope is that we're going to be in a

21  position --

22      THE COURT: So for me sitting on the bench this time

23  things happen.  Do I need to do that all the time?  No.  The

24  answer is

25      MR. STEVENS: There's no right answer, Judge.

11

1      THE COURT: Go ahead.

2      MR. STEVENS: So I think that unless somebody wants to

3  speak or address --

4      THE COURT: Does anyone wish to be heard on any

5  matters that we -- that has been categorized as settled and

6  resolved, default judgments entered, Jerry Self Storage cases?

7      MR. STEVENS:  I can't mark them as settled or

8  resolved.  They will tell you --

9      THE COURT: The first one, I meant the first one.

10      MR. STEVENS: You're starting on number one?

11      THE COURT: Yes.  Number one, settled and resolved.

12  Number two, default judgments entered, and number three,

13  Jerry's Self Storage.  I know those are not settled.  I see

14  that they're in settlement discussions but does anyone wish to

15  be heard on these matters today?

16      Having heard none, we will reschedule those at some

17  point in a minute.  Okay.  We're now at number four, active

18  cases.

19      MR. STEVENS: We're at number four.  First, I have one

20  correction to note and Mr. Steinberg pointed it out to me and I

21  failed to amend it on the amended agenda, but the first case,

22  Barbara Callaghan is actually represented by Mr. Alter's firm

23  to which Mr. Steinberg is of counsel.  I have it noted as Mr.

24  Steinberg's name.  A firm is actually of counsel to record

25  which is not correct.

12

1          THE COURT: Thank you.

2          MR. STEVENS: With respect to the first adversary

3   proceeding, we have --

4          THE COURT: Wait a minute.  Mr. Steinberg, you have

5   your own firm but then you're of counsel to another firm?

6          MR. STEINBERG: Yes.

7          MR. STEVENS: With respect to that first adversary

8   proceeding, Your Honor, last week we sent a proposed scheduling

9   order in our initial Rule 26 disclosures.  We have not yet

10  conferred with Mr. Steinberg to see if the proposals and the

11  deadlines that we proposed were acceptable.  They're hoping to

12  have a moment to do that today but --

13         THE COURT: Mr. Steinberg has risen.

14         MR. STEINBERG: The scheduling order is acceptable.

15         THE COURT: Very good.  Thank you.

16         MR. STEVENS: That being the case, Your Honor, I could

17  go through the dates or I could just give and say that we'll

18  submit a consent order.

19         THE COURT: Please do.

20         MR. STEVENS: Excellent.  Thank you, Your Honor.  I

21  believe the second case --

22         THE COURT: We might have to add some dates or do

23  something at some point but okay.

24         MR. STEVENS: The second adversary proceeding I would

25  suggest that we skip over because there's a contested matter

13

1  with respect to the motion for default judgment and a contest

2  have been filed in the JMR adversary proceeding.

3  THE COURT: When is that returnable?

4  MR. STEVENS: It's returnable today. Your Honor

5  scheduled a hearing on Wednesday of last week scheduling it for

6  today.

7  THE COURT: Okay.

8  MR. STEVENS: So it has been fully briefed.

9  THE COURT: And I do have my memos. I'm a little slow

10  right now.

11  MR. STEVENS: The third adversary proceeding against

12  Oritani Bank we've had discussions with counsel to Oritani

13  who's sitting over here to my right, Mr. Catuogno. Mr.

14  Catuogno -- Oritani intends to file an amended answer to add

15  John Magee as a necessary defendant and party to that action.

16  We're going to have no objection to that and would be happy to

17  stipulate to it but it also makes the discussion of a

18  scheduling and -- a scheduling order premature because we're

19  going to be adding another party. So the suggestion would be

20  that we allow them to do that and reconvene once issue has been

21  joined or there's been a default by the --

22  THE COURT: We'll work that out. All right.

23  MR. STEVENS: The final category I just classed as

24  other because I did not have -- it didn't fit in the other four

25  I didn't think. So the first, 99 Roland Street, I didn't hear

14

1   if anyone is actually here today.

2       THE COURT: Is anyone here representing 99 Roland

3   Street, Park Ridge, LLC?

4       No, okay.

5       MR. STEVENS: Interestingly, Your Honor, issue hasn't

6   been joined but they've been through three lawyers.  These

7   defendants, including my prior law firm, which is still

8   actually counsel of record although they informed me in

9   November that they were being replaced by Mr. Gareno's [Ph.]

10  firm who I have second.  The last voluntary extension in terms

11  of the time to answer that was January 3rd.  Our intent is

12  unless -- until we get them on the phone when we leave here and

13  there is an agreement it would be acceptable to Your Honor that

14  they answer and join issue that we need to move for a default

15  judgment.

16      THE COURT: Well, not only move for a default

17  judgment.  I don't want -- I won't excuse anyone from not

18  appearing in this matter.

19      MR. STEVENS: Understood.

20      THE COURT: So the next time we have a hearing I will

21  expect a lawyer for this 99 Roland Street to appear in this

22  Court.

23      MR. STEVENS: I will inform them.

24      THE COURT: And if you will let them know because I

25  will definitely issue an order to show cause if they do not.

15

1          MR. STEVENS: I will inform them of exactly that, Your

2    Honor.

3          THE COURT: Okay.

4          MR. STEVENS: The second, Priscilla Mulligan, Ms.

5    Mulligan has defaulted.  We have been approached by Mr. Magee's

6    counsel who is trying to assist in the resolution of this

7    adversary proceeding which we were happy to have those

8    discussions.  We've extended their time to file an objection to

9    our motion for default judgment to January 25, 2013.  If --

10         THE COURT: I think that's fine but there's a little

11   bit of the same thing.   She either needs representation or

12   not.  I don't -- I think it's wonderful that anybody is trying

13   to help with any kind of settlement but at some point somebody

14   has got to stand up and say they represent her.

15         MR. STEVENS: Understood, Your Honor, and I'll relay

16   that as well.

17         THE COURT: Thank you.

18         MR. STEVENS: And the third adversary proceeding is

19   the complaint against Provident Bank and Mayer Hirsch.  We had

20   added Mr. Hirsch late in he game under an amended complaint and

21   issue was just joined yesterday.  Mr. Hirsch is represented by

22   Mr. Condon who's here in Court today.  Provident Bank is

23   represented --

24         THE COURT: Bring it up right fast.

25         MR. STEVENS: I've made counsel tell me her name no

16

1    less than 14 times today and I've rudely messed it up each and

2    every time.  So I'll say Cullen -- excuse me, Provident Bank is

3    represented by Cullen and Dykman.

4          THE COURT: Put it on the record again so he'll hear

5    it.

6          MS. ABOULAFIA: Elizabeth Aboulafia.

7          THE COURT: Aboulafia?

8          MS. ABOULAFIA: Yes.

9          MR. STEVENS: I'm practicing in my head.

10          THE COURT: Okay.  Good.

11          MR. STEVENS: Okay.  I've got it.

12          THE COURT: But there's counsel -- have you -- you

13    filed an amended complaint and given time for an answer?

14          MR. STEVENS: Yes.  Both Mr. Hirsch and Provident Bank

15    have joined issue.  Provident Bank it appears, and I'm saying

16    this subject to our review of the actual count formation

17    documents but it appears that Provident was merely the bank

18    where Mr. Hirsch held the account and received a transfer.  We

19    had read and interpreted it based on how it was written in the

20    books and records and the bank statements as being a transfer

21    directly to Provident for its benefit and named them as a

22    defendant because of that.  Once we get -- if we get the

23    documentation necessary to verify it Provident Bank will likely

24    be stipulated out by agreement between us and Mr. Hirsch.  And

25    I'm sure Ms. Aboulafia is hoping that this is the last time

17

1    that she has to come here.

2              THE COURT: Very good.

3              MS. ABOULAFIA: Thank you, Your Honor.  We'll provide

4    subject to receiving a document request from the Trustee since

5    the bank has privacy concerns that they need a formal request

6    before they can provide the documentation.  They will provide

7    documentation to demonstrate that are mere conduit financial

8    intermediary.  We hope to stipulate to the dismissal of

9    Provident as a defendant.

10             THE COURT: Very good.

11             MR. STEVENS: Ms. Aboulafia is being -- I'm sorry,

12   Your Honor.  She's actually being very kind and not calling me

13   out because they requested that over a month ago.  Ms.

14   McLoughlin drafted it and sent it to me and we just realized

15   today that it stopped here and I didn't actually forward it.

16             THE COURT: Cup and lip -- slip between the cup and

17   lip.

18             MR. STEVENS: And that was my fault.  So it is

19   drafted.  We'll get that written request so we can hopefully

20   get that resolved very quickly.

21             THE COURT: Thank you.

22             MR. STEVENS: With that, Your Honor, that concludes

23   the pretrial conference with respect to --

24             THE COURT: Let's talk about adjournments to any one

25   of those matters that we might need to.  When do you want to

18

1    come back on those?

2           MR. STEVENS: Since we're going to be stipulating and

3    there's a -- either hopefully settling and resolving or

4    stipulating to the addition of defendants.  We're stipulating

5    people out.  It seems like there's -- 60 days would be an

6    appropriate time to get all the things that we discussed here

7    today done or not done and come back and move forward.

8           THE COURT: Understand.  Understand.  March the 5th for

9    everybody in the courtroom?  March 2nd is Texas Independence

10   Day.  I'd have a margarita or so but how about March the 5th?

11          MR. STEVENS: I'm sure that's fine, Your Honor.

12          MALE VOICE:  Is that at noon time, Your Honor?

13          THE COURT: Please.  This is abnormal to be so late.

14   Were you all here the week before Christmas?  We heard 924

15   matters and they were all on time but we've had had a lot of

16   rulings today.  Very good.

17          If anyone wishes to be adjourned on any matter that

18   we have now adjourned to that date, they may be excused.  Thank

19   you.  You have a good day and thank you for coming.

20          Now then --

21          MR. STEVENS: That brings us, Your Honor, to number

22   two on the calendar.  The second thing on the calendar is

23   adversary proceeding number 12-9072, Messer v. GMR LLC, et al.

24          THE COURT: Okay.  GR -- GMR LLC, 12-09072?

25          MR. STEVENS: Yes, Your Honor.  Did Mr. Ricci come

19

1   here today?  I'm asking.  Mr. Ricci interposed a pro se papers.

2            THE COURT: I saw that.  Mr. Gary Ricci.  Is Mr. Gary

3   Ricci in the courtroom?  Mr. Gary Ricci.  Have you been in

4   contact with Mr. Ricci?

5            MR. STEVENS: We have, Your Honor.  I did send to him

6   the amended agenda along with everyone else.  The one thing I

7   would say that he wouldn't benefit from is to the extent that

8   the ECF provides an additional notice he's certainly not

9   registered with ECF but --

10           THE COURT: Why don't you stand and tell the Court

11   since you're the one that spoke to him?

12           MR. STEVENS: She'll be the one testifying on most of

13   the matters anyway.

14           THE COURT: Testifying?  You're a lawyer; correct?

15           MS. McLOUGHLIN: Yes.

16           THE COURT: State your name and affiliation.

17           MS. McLOUGHLIN: Maeghan McLoughlin with Klestadt &

18   Winters for the Trustee.

19           THE COURT: Ms. McLoughlin, you had something to say

20   about contact with Mr. Ricci?

21           MS. McLOUGHLIN: Yes.  I've been in contact with him.

22   I spoke with him on Thursday and told him about the hearing

23   today at noon in this courtroom.

24           THE COURT: And you --

25           MS. McLOUGHLIN: But I did not hear back from him.

20

1        THE COURT: Okay.  Thank you.  At any point -- let me

2  just ask you a question.  At any point did anyone bring it to

3  his attention that he cannot represent a corporation because

4  he's pro se?  Do you know?

5        MS. McLOUGHLIN: I have not spoken with him directly.

6        THE COURT: You don't have to.  I was just curious.

7        MS. McLOUGHLIN: I have not told him.  It was in our

8  response to the Roncati objection which I emailed Mr. Ricci a

9  copy of so that he would have it but I personally did not

10 advise him.

11       THE COURT: That's fine.  Thank you.

12       MR. STEVENS: If it please the Court I'll continue

13 with the motion for default.

14       THE COURT: Certainly.

15       MR. STEVENS: Your Honor, we filed a motion for entry

16 of default judgments and there have been responses and

17 objections to those.  To preface the matter because I know that

18 this typically is a significant issue for the Court and I

19 acknowledge all the case law and the Court's general

20 disposition that everything be resolved on the merits when and

21 if it can be.  All of that stipulated and admitted and I'm

22 saying that in preface to why I'm here and the fact that this

23 is -- I think it was in 2008 I stood before Judge Drain and

24 said it was the first time in my career I ever held someone to

25 a default when there was a contest.  This is the second time in

21

1  my career I've ever held someone to a default.  It's not

2  something we do lightly.  I think we've waived numerous

3  defaults already in this case.  It's something we do only when

4  one, we absolutely believe that we're being gigged.  We believe

5  that the party on the other side is just not taking it

6  seriously or has intentionally decided that they don't need to

7  respond or don't need to pay attention to papers that come from

8  our office or from this Court and it's very much an intentional

9  decision.  We also only do it when we believe that there's

10 nothing to be gained by going through the cost and expense of

11 litigation.  In other words, there's no meritorious defense.

12        To walk through briefly -- I know Your Honor is --

13 has received the papers and I don't want to rehash the things

14 that you find in there but to go through briefly.  One, there

15 doesn't appear to be any contest that these groups of

16 defendants were properly served.  Mr. Ricci admits that it is

17 in fact his address, the one that we did serve and serve by

18 mail.  He also admits that he had received a copy of the

19 summons and complaint in October of last year.  Mr. Roncati

20 also admits that at least two of the addresses that we served

21 summons and complaint --

22        THE COURT: Is Mr. Roncati here?  Are you representing

23 Mr. Roncati?

24        MR. WALKER:  I am, Your Honor.

25        THE COURT: Thank you.

22

1      MR. STEVENS: At least two of the addresses, both his

2  professional address and his home address, were correct

3  addresses but says that with respect to the business address

4  that that address houses many businesses and often mail gets

5  mixed up and also states that with respect to the home address

6  it may have -- it may be the case that his housekeeper who is

7  also in charge of collecting mail may have inadvertently thrown

8  it out or misplaced it or something else.  So we know that the

9  addresses are correct.  There is just a general statement that

10 they didn't see it and know about it.

11      Now, with respect to Mr. Ricci, and Mr. Ricci as Your

12 Honor noted earlier, put in an answer pro se on behalf of two

13 entities which doesn't appear to be in contest that that's not

14 something that's permissible but Mr. Ricci says I got the

15 papers in October.  Whether he says he got them properly or

16 improperly he admits that he has them in October of 2012 yet he

17 did not file an answer.  He did not call our office, email us,

18 reach out in any way until December 3, 2012.  So there's

19 admittedly over 31 day lapse, at least.  If he were to receive

20 it the last day in October in the month that he says he

21 received it and doesn't call until December 3rd there's at least

22 a 31 day lapse -- excuse me, it would be a 33 day lapse between

23 his receipt, acknowledged receipt of this document and reaching

24 out to our office to ask for an extension.

25      THE COURT: Over a month in other words.

1    MR. STEVENS: Exactly, Your Honor.  Now, Mr. Roncati

2  says that he actually didn't know about the adversary

3  proceeding until -- I believe he said he was told about it by a

4  colleague.  I would assume he's referring to Mr. Ricci but he

5  didn't know about it.  But the issue we have with that is not

6  only do we serve it two addresses and make good service but we

7  have a history with Mr. Roncati that makes that statement very,

8  very difficult to believe.

9         First, documents that have been sent to Mr. Roncati's

10  address, including service of our summons and complaint in the

11  _Messer v. Magee_ adversary proceeding back in September of 2011

12  were simply returned with our firm name circled and refused

13  written on it.  So we have a -- I'm not saying he was supposed

14  to accept service for these people.  What we have a history of

15  an identifying the name on these envelopes and somebody writing

16  refused on it very intentionally and sending it back.   That's

17  one example.

18         The second example that's more recent and I think

19  more profound is Mr. Roncati was served with a third party

20  subpoena recently in the _Messer v. Magee_ adversary proceeding

21  compelling his -- the production of documents by October 31st

22  and his deposition in our office on November 14th.  Mr. Roncati

23  did not respond and did not produce documents by October 31st.

24  So we Fed Ex'd Mr. Roncati a letter noting the default.  The

25  letter was received by his business address and was signed for

24

1  by someone we've identified via his website as an associate and

2  a member of his architectural firm and again we received no

3  response.  On November 12th Ms. McLoughlin places a call to Mr.

4  Roncati's offices and the person she speaks to when she asked

5  to speak with Mr. Roncati and says who she is says hold on, he

6  just came in and let me go -- let me go tell him you're on the

7  phone.

8        After being left on hold for a period of time Ms.

9  McLoughlin is taken off of hold and is told that he's never

10 heard of you, he's never heard of your firm, he's never heard

11 of the FKF case and he's not going to speak to you.  So Ms.

12 McLoughlin replies well, he should know, we've served him with

13 a subpoena, have him call me.  His deposition is scheduled to

14 take place in two days.

15       Then -- we admit it's the case that we received a

16 message from Mr. Shaw's law firm the following evening,

17 November 13th.

18       THE COURT: So right after that?

19       MR. STEVENS: Right.  Within -- the following evening.

20 So that was November 12th and November 13th a message is left on

21 Ms. McLoughlin's voice mail saying that Mr. Roncati won't be

22 showing up to his deposition and that -- and announcing

23 themselves as potential counsel for Mr. Roncati.

24       THE COURT: So at that point it's still potential

25 counsel?  Okay.

1        MR. STEVENS: We unfortunately didn't collect that

2    message until I sat in the conference room with the court

3    reporter for about 30 minutes.  Noted Mr. Roncati's default and

4    failure to appear.  Then we noticed that the red light on Ms.

5    McLoughlin's phone was on and there was a message from

6    yesterday evening.  Of course no attempt to give written notice

7    that he would not be attending that day or to make sure that

8    there's human contact with our office or some other form of

9    communicating.  His just stated intention he's not going to

10   show up.  Not a request.  Just I'm not going to be there.

11       So following that we had conversations with Mr.

12   Roncati's potential counsel where it was requested that we

13   extend the time to respond to our motion for default judgment

14   which we agreed to.  We were not willing to waive the default.

15   We still are not willing to waive the default but we agreed to

16   an extension of time so that they can answer and state -- tell

17   us why you didn't reply and also tell us what your defense is

18   going to be.

19       By December 18th and in between this point in time and

20   December 18th Ms. McLoughlin reaches out several times to

21   schedule a deposition and to get that back on -- the matter

22   back on track in the Messer v. Magee adversary proceeding

23   because as Your Honor knows and we'll hear in a moment we're

24   facing a February 1 discovery cutoff and we need to get these

25   things done and doesn't actually hear from them until December

26

1  18th when she's told by counsel that their client is not -- has

2  been I think -- I don't what the words he used were but has not

3  been returning calls and they have just gotten in contact, are

4  now able to confirm this date for deposition.

5          At this time I'll state we still do not have a single

6  document production from Mr. Roncati but we do have an

7  agreement and confirmation that he will be appearing in our

8  offices on Thursday, two days from now at ten a.m.

9          THE COURT: Two days from today?

10         MR. STEVENS: Two days from today for his deposition,

11  third party deposition in the Messer v. Magee adversary

12  proceeding.

13         So based on the history with Mr. Roncati and his

14  refusal of service and what appears to be a clear admission

15  that service was proper and also with Mr. Ricci who on his own

16  admission had these papers for over month, we don't think

17  there's any question that the defaults were willful.  There's

18  no question certainly in our minds that we are being gamed.  At

19  the very least they see mailings and papers from our office and

20  don't think it's worth reading them, opening them or looking at

21  them and I don't know what the logic is or the reason behind

22  that but it seems to be a common theme.  I will say we've had

23  many adversaries both here today and throughout this case, none

24  of which have claimed to not received things from our office or

25  received what is usually many, many attempts to get in contact

 1    with people before we come here.  That's point number one.

 2          The second point, Your Honor, is that we do not see a

 3    meritorious defense.  To summarize what this claim is about it

 4    very simple resolves one transaction.  Most of the parts of the

 5    transaction are not contested.  FKF 3 loans $1.5 million to GMR

 6    pursuant to a promissory note and related agreements.  That

 7    obligation is guaranteed by Mr. Ricci and Mr. Roncati.  This

 8    takes place in April 2006. $1.1 million of that $1.5 million

 9    principle is given to GMR or its designated recipients.

10    Another $400,000.00 of the $1.5 million is set aside as

11    collateral for the repayment of the $1.1 in this cash

12    collateral account.

13          By August of 2006, so just four months later, there's

14    a decision that Mr. Ricci is going to be removed from the deal,

15    that Mr. Roncati is going to take over Mr. Ricci's interest in

16    what is the Aventine Edgewater project and in exchange for the

17    transfer of his ownership interest to Mr. Roncati, Mr. Roncati

18    is going to, among other things, take over this loan.  What

19    happens in this document we call the purported release --

20    because until one month ago we still had not seen a signed copy

21    of it.  Now we've seen a copy that appears to have Mitchell

22    Klein's signature on it on behalf of FKF 3 but pursuant to this

23    purported release the obligations of GMR are transferred and

24    assigned to Ariston Properties which is a company owned by Mr.

25    Roncati whereas GNR was owned by Mr. Ricci and Mr. Ricci and

28

1  Mr. Roncati are released from their obligations under the

2  guarantee.

3          To start with, we have a number of issues with the

4  written document.  Even if we assume, even if we assume that

5  this document is what it says it is and it was signed by

6  Mitchell Klein, he document in the context of this series of

7  transactions it makes sense that Mr. Ricci would be receiving a

8  release because he's walking away from this deal.  It makes

9  absolutely no sense that Mr. Roncati would receive a release

10  and the terms and the language of the document reflect what

11  appears to be almost a carroting in of Mr. Roncati's name.

12  Paragraph 5 of this purported release is what gives the release

13  to the guarantors, to Mr. Ricci and Mr. Roncati.

14          But if you read further, Paragraph 6 states a clear

15  reaffirmation of any obligations Mr. Roncati has --

16          THE COURT: Let me interrupt you, Mr. Stevens, and I'm

17  sorry to do this.  Mr. Sapir, I said don't take adjournments.

18  This is going to go on.  Go take adjournments.

19          THE COURT: Go ahead.

20          MR. STEVENS: I'll try to be -- so Mr. --

21          THE COURT: You don't have -- they're taking

22  adjournments now.

23          MR. STEVENS: So Paragraph 6 of this purported

24  release, Your Honor, reflects a whole different context.  It

25  states that even though -- dispute Mr. Ricci's release Mr.

29

1    Roncati reaffirms all obligations that he has under the loan

2    documents and is not -- a notwithstanding type paragraph

3    reaffirming Mr. Roncati's obligations.

4         Paragraph 9 does exactly the same thing making

5    Paragraph 6 and Paragraph 9 completely conflicting with

6    Paragraph 5.  Mr. Ricci's release, although we think that it

7    makes contextual sense that he would be a part of this release,

8    is equally confusing because if you read the release paragraph

9    it says Mr. Ricci is not released from any obligations that

10   accrued before the date of this document which would be all the

11   obligations due under the loan documents.

12        I'm pointing that out to say that we have with --

13   even if we assume and even if a fact finder at some point in

14   time were to say -- or excuse me.  That, first of all, there's

15   a number of issues with the document.  Set that aside for a

16   moment.  We pled in the alternative.  We said even if the Court

17   ultimately finds or the fact finder ultimately finds that this

18   release is a valid and binding document against FKF 3 and Mr.

19   Ricci and Mr. Roncati were indeed released by it and at that

20   point in time we hadn't seen a signed copy but we're assuming

21   maybe a signed copy surfaces at some point and it ultimately

22   did, that even if it doesn't matter because the release itself

23   is a fraudulent conveyance to FKF 3.  It makes absolutely no --

24   this transaction is the silliest thing from FKF 3's perspective

25   that you could possibly imagine.

1    According to this transaction FKF 3 in the assignment

2  of the obligations from GMR to Ariston and the release of

3  Roncati and Ricci as personal guarantors, FKF 3 receives zero,

4  nada, nothing in this transaction and they lose two individual

5  guarantors on a loan.  They lose a corporate guarantor on the

6  loan and they in fact give another $226,583.34 out of their own

7  collateral and give it to Mr. Ricci which apparently we have

8  yet to understand.  It apparently is some flow of consideration

9  we're assuming for Mr. Ricci's transfer of his equity interest

10 in Mr. Roncati and the project.  But it makes no sense.  We

11 looked very clearly.  FKF 3 -- giving these releases to these

12 two gentlemen was an absolute fraudulent conveyance.  What

13 consider did FKF 3 receive?  That allegation has not -- neither

14 Mr. Ricci or Mr. Roncati have said what they gave.  There is

15 no -- they haven't stated a defense to that.  Even if this

16 weird questionable bizarre release actually has some meaning

17 and is a real document and the Court says I'm dismissing your

18 arguments with respect to these ambiguous provisions that make

19 no sense why is it not a fraudulent conveyance.  It is a clear

20 fraudulent conveyance.  FKF 3 got nothing and they haven't even

21 said FKF 3 got nothing.  They haven't even addressed that

22 allegation.

23    So we cannot see where certainly Mr. Ricci and Mr.

24 Roncati where they have a meritorious defense.  This issue gets

25 highlighted even more when you look at the Ariston obligation.

31

 1   Interestingly, we --

 2           THE COURT: Refresh me on Ariston.  That's Roncati?

 3           MR. STEVENS: Mr. Roncati's company.  Under the

 4   purported release was assuming the obligations of GMR.

 5           THE COURT: Right.

 6           MR. STEVENS: This is interesting, Your Honor, because

 7   Ariston we sued for $1.1 million.  We did not sue them for the

 8   full $3.2 and change that we believed to be due under the loan

 9   documents because it's our allegation the purported release is

10   a non existent document, assignment never happened.  So we've

11   sued Ariston only as a beneficiary of the identified transfers

12   that were made by FKF 3 to the GMR borrowers.

13           Now, Mr. Roncati says that the purported release was

14   a real live signed agreement and it's effective.  Well, if it

15   happens to be effective then we're wrong and Ariston actually

16   owns -- owes in excess of $3.2 million, not the $1.1 that we've

17   sued on.  But interestingly, what he said is that Ariston

18   doesn't actually owe FKF 3 the money except to the extent of

19   the value of the pledged collateral of one development's

20   membership interest in the Aventine project.  The argument

21   makes no sense and they don't even try to correlate it to any

22   written documents.  The ones that they're submitting are the

23   ones that were annexed to the complaint.  The argument makes

24   absolutely no sense.  If that argument is true FKF 3 gave one

25   point and admitted $1.5 million in actual value in 2006.

1  Nobody ever tried to service this note.  There's not a single

2  interest payment ever made, not a single principle repayment

3  and FKF 3's only recourse to get this money back is to

4  foreclose on membership interest that -- and one development

5  Edgewater has in the project.

6          THE COURT: Mr. Stevens, let me just hear you

7  carefully for a moment because I'm listening and you have said

8  no meritorious defense and I'm listening but you've outlined

9  some very complicated issues in your papers and what you said

10  today.  So how is it that I can rule on the default when what

11  you're saying to me is fairly complicated?

12          MR. STEVENS: I think that the -- the way that I'm

13  explaining the issues and there would be a number of

14  complicated issues.  I think the one place that nobody can get

15  past is that the -- the release was a fraudulent conveyance.

16  We alleged it very clearly.  If that release exists which we

17  didn't think it did at the time --

18          THE COURT: You haven't seen it.

19          MR. STEVENS: We've now seen it because it was annexed

20  to Mr. Ricci's response and then adopted by Mr. Roncati.  I

21  will say that Mr. Roncati in 2010 when requested by our

22  predecessor Dave Seckler was asked to pay this obligation.  Mr.

23  Roncati said no, there's a release and Mr. Roncati produced a

24  release at that time.  That was a black lined copy of the

25  signed release we're now being given but was signed by

33

1    everybody except for FKF 3.  So what we had until a month ago

2    only was a black lined copy of a release that was not signed by

3    the one person who was to be charged by it.

4         But here's the reason why you can cut through all

5    those things.  I've perhaps been over broad in sharing all the

6    bizarre issues and the problems and I've done it for a specific

7    reason which I'll tell you.  But the one thing they can't get

8    by is it's okay, this release exists.  It's a fraudulent

9    conveyance.  Why is it not a fraudulent conveyance?  Tell us

10   what consideration Mr. Roncati gave.  They haven't even alleged

11   that he's given consideration.  There's been no address to that

12   allegation and what was outlined in actually three separate

13   causes of action as the fact that okay, if this release exists

14   why is it not a fraudulent conveyance.  This transaction is

15   nonsense.  FKF 3 received absolutely nothing.  If there's a

16   defense we certainly haven't heard it.

17        So I agree that if -- with respect to the document

18   itself we've highlighted those issues only to show that there's

19   tons of issues there.

20        THE COURT: But the real thing for you is the

21   consideration.

22        MR. STEVENS: For us today right here and now, right.

23   They haven't even tried to answer the fraudulent conveyance

24   claim, the claim that the purported release even if there's a

25   good document and the Court does not care about any of the

34

1   ambiguities or all of the complex problems we point out with it

2   why that release is I can't avoid it fraudulent conveyance, why

3   I can't shred it up, throw it out and say pay me the money that

4   you borrowed.

5           THE COURT: Okay.

6           MR. STEVENS: That's where it all goes back to.  It's

7   the same thing -- the reason I was getting into the Ariston

8   stuff which is where I think I started to lose myself a little

9   bit if not the Court, with the complexities on the Ariston side

10  but the Ariston stuff I was pointing that out to say the

11  complexities there aren't by us.  The complexities there are

12  manufactured by Mr. Roncati because the complexities are -- if

13  Mr. Roncati's allegation is right there's a clear document

14  where Ariston assumes obligation to pay this note it's a no

15  brainer.  I mean that's an easy one.  Still we're manufacturing

16  an incredibly bizarre defense that has no support, or at least

17  none that's shown and none that I've seen in the 50 times I've

18  read these documents that would say that FKF 3's limited to

19  collecting against an admitted obligor on an obligation to the

20  extent of a collateral basis -- it just makes no sense.  I was

21  actually highlighting more to show that the -- if anything a

22  disingenuiness or lack of intellectual honesty in making --

23  taking positions and making claims and claiming defenses.

24          We just can't possibly see a meritorious defense

25  to -- even if you see that there's one I admit we can argue

35

1   about the document -- the contract all day and that's something

2   where we could at the very least have summary judgment motions

3   and all that stuff but it doesn't matter because there's been

4   absolutely no answer to the fact that the release if it exists

5   is a fraudulent conveyance.  What consideration was FKF 3

6   given?  No allegation that no, they were solvent at the time.

7   Nobody is saying that.

8            THE COURT:  Okay.

9            MR. STEVENS:  So, one, we think we're being gamed.

10  We think the defaults were willful, that there was at the very

11  least an attempt not to open anything or bother reading

12  anything that came from our offices because we've been targeted

13  as being an enemy and that there's -- nobody wants to look at

14  those things.  Mr. Ricci admits to having a document for a very

15  long period of time and doing nothing.

16           THE COURT:  Your associate also made the phone call?

17           MS. McLOUGHLIN:  Yes.

18           THE COURT:  You heard what, your colleague said is

19  that what happened when you called?

20           MS. McLOUGHLIN:  Which phone call?

21           THE COURT:  The one where you called and they said I

22  don't know you, I don't know your firm, I'm not going to do

23  anything?

24           MS. McLOUGHLIN:  Yes, that's exactly what happened.

25           MR. STEVENS:  That was stated in Ms. McLoughlin's

36

1  affidavit that we submitted which --

2          THE COURT:  I understand that she is here now.

3          MR. STEVENS:  Which I would ask to submit as direct.

4  She is here to be cross-examined if anyone has an issue. I

5  don't know that we have issues with respect to those exchanges.

6          THE COURT:  I don't either but I just wanted to make

7  sure that who did it and where -- I know about the affidavit.

8          MR. STEVENS:  The third element and I want to sum up

9  very quickly of course is the prejudice that we think will come

10 to FKF 3.  The FKF Trust is a trust that is seeking recover on

11 account of admitted fraud victims.  They have -- these are

12 folks that many of which gave their life savings over to FKF 3

13 under pretenses they would allege -- that's been an allegation

14 that's been played out in this Court in multiple settings and

15 of course is the subject of additional litigation but the point

16 is this is the prejudice that would be felt by the FKF Trust if

17 it has to spend money with a case and then prosecuting a case

18 to which there's no meritorious defense and you have defendants

19 and parties sitting on the other side who are simply not

20 respecting processes of this Court.

21          We'd also state as a monetary prejudice that -- and

22 we have not compounded, Your Honor, and I read -- I like to

23 read papers clearly -- liberally as possible that favor my

24 client's position.  We were pretty conservative here.  I

25 couldn't find a reason to compound interests or a contractual

37

1  basis to compound interests.  So we've only, only accumulated

2  interest on the $1.5 million principle and we never compounded.

3  Again, could not find a contractual basis to do so.  We still

4  are continuing to accrue interest at $821.92 every single day

5  on the $1.5 million principle and nobody is stating -- nobody

6  is coming to the Court and saying well, we got these

7  meritorious defenses and here's some protections we can offer.

8  If we're wrong, you know, we're going to be stuck with probably

9  by the time we got done with this a $4 million obligation

10  instead of a $3.3 and there's no -- there's -- we can't see any

11  way or certainly have not been offered any idea how we're not

12  going to be prejudiced by that and having an additional

13  obligation.

14          So, again, we believe that we have been prejudiced by

15  the default.  We'd be prejudiced by lifting the default and

16  allowing these matters to go forward.  With that stated, Your

17  Honor, I think I can stop talking and let Mr. Roncati's counsel

18  make a presentation unless Your Honor has questions.

19          THE COURT:  I have one.  Excuse me.  You may be

20  seated.  No, I don't -- before you stand up.  The Briggs

21  matter, what have we got?  Everybody can stay exactly where

22  they are.

23                  [Pause in proceedings.]

24          MR. WALKER:  Good afternoon, Your Honor.

25          THE COURT: Good afternoon.  You're going to have to

38

1   pull that microphone up so we can hear you.

2          MR. WALKER:  Hazard of being my height, Your Honor.

3   So I feel the need to

4          THE COURT: State your name and affiliation for the

5   record.

6          MR. WALKER:  I'm sorry, Your Honor.  Romain Walker

7   from the Law Office of Charles Shaw on behalf of defendant

8   Conrad Roncati and I'm sorry.  Ariston Properties.

9          I feel that is somewhat incumbent upon me to

10  rehabilitate Mr. Roncati's reputation which has been somewhat

11  maligned for the last 15 minutes or so.  I'll begin with --

12         THE COURT: Let me be a little clear about that.  Not

13  the last 15 minutes.

14         MR. WALKER: Okay.

15         THE COURT: It's been ongoing since this case was

16  filed.

17         MR. WALKER: I see.

18         THE COURT: So don't -- you need to understand that

19  this Judge has already been aware of the fact that this has not

20  been answered.  So why don't you cut to the chase and go to the

21  meritorious defense and then you can fall back on the other but

22  I want to hear the meritorious defense.

23         MR. WALKER: Certainly, Your Honor.  Well, from what

24  I've heard -- well, let me start with just a brief synopsis of

25  the standard.  For a meritorious defense it's not incumbent

39

1   upon the defendant to prove his case in totality, to prove the

2   facts are absolutely true.  It's simply to present a situation

3   where the fact finder may find that there is a dispute here or

4   there is an issue to be resolved.

5           THE COURT: Right.

6           MR. WALKER: Now, having said that, the central issue

7   seems to be what consideration was given to FKF for Mr.

8   Roncati's release.  That is the factual question.  I am not

9   exactly sure of the consideration but I've had a discussion

10  with Mr. Roncati and I can speculate.  One possible situation

11  is that FKF requested that Roncati take over Mr. Ricci's duties

12  and the management of the project.  This was negotiated, the

13  terms of this was negotiated.  It was negotiated between the

14  parties.  FKF may have felt that it was worth the release of

15  Mr. Roncati to have him as an architect to take over the

16  project.  Now, again, I say that as just a sort of off the top

17  of my head speculation but the greater point being that that is

18  a fact about which there's no record.  There's nothing before

19  the Court.  That is something to be determined.

20          What the Trustee would like to say is that this

21  absence of this -- any such record necessarily means that there

22  is no -- there was no consideration and that simply can't be

23  the case.  That is a factual determination being made in the

24  absence of facts.  It is simply to say that we're looking at a

25  document here which taken at face value which I think is

40

1  appropriate that we do at this juncture, taken at face value

2  removes liability from Mr. Roncati and potentially limits the

3  liability of Ariston Properties.  That is sufficient to meet

4  the meritorious defense standard.

5         It is not incumbent among us to expand and answer

6  every single question that opposing counsel may have about the

7  nature of this document, underlying negotiations and so forth.

8  So I'll stand on that.

9         Now, with regard to -- I'll just briefly discuss

10 prejudice.

11        THE COURT: Okay.

12        MR. WALKER: I think it's clear here that a weighing

13 of the prejudice certainly -- it certainly weighs in favor of

14 the defendants here.  On the one hand we have the prejudice

15 being asserted against plaintiff being that interest is being

16 accumulated.  I personally fail to see how accumulated interest

17 is a prejudice in that you're gaining more money over time.  I

18 fail to see how that is prejudice because theoretically you're

19 supposed to recover that.  Now, conversely, when you look at

20 defendants we're looking at a $4.2 million judgment, a $4.2

21 million judgment in the presence of a document which if taken

22 at face value would absolve him of liability.  I don't see how

23 you can weigh the prejudice and end up in any other way except

24 that -- the prejudice to defendant would certainly outweigh the

25 prejudice to the plaintiff.

41

1          Now, with regard to service, Mr. Roncati's

2     certification was a long winded way of saying I don't know what

3     happened to the documents.  I never received them.

4          THE COURT: So what's the standard on service?

5          MR. WALKER: The standard on service is that it has to

6     be willful and willful is there has to be more than mere

7     negligence.

8          THE COURT: It's good mailing is what service is.

9          MR. WALKER: Oh, certainly, good mailing, but in terms

10    of -- I'm sorry, I'm determining the standard as for

11    willfulness, willful disregard or willful default, and that

12    standard is beyond mere negligence.  Now, I don't think we can

13    get beyond mere negligence here.  I'm briefly going to

14    reference the affidavit of service with regard to the subpoena

15    which was discussed at length.

16         The subpoena, the subsequent conversation between Mr.

17    Roncati and Ms. McLoughlin.  The subpoena states or the

18    affidavit of service for the subpoena states that it was

19    received by a Ms. Smith, approximately 34 year old Asian woman

20    of 5'6" height.  I've spoken to Mr. Roncati yesterday after

21    receiving this and he advises me that there is no one in his

22    employ who has that name and matches that description.  So to

23    me it seems reasonable that someone calls about it, you say

24    I've never heard of this, I don't want to talk to you about it,

25    I don't want to get pulled into this litigation.

1       Now, we have this other litigation where Mr. Roncati

2 is scheduled to give a deposition which is the subject of this

3 subpoena and I personally can see being confused as to what is

4 what.  There's -- the parties or the plaintiff's names are very

5 similar.  Some of them you have to respond to; some you don't.

6 I think it's reasonable to say that it was negligence that

7 caused him to either disregard, ignore, overlook these

8 documents but we have here now is that he was -- when he's

9 finally made aware of the gravity of these proceedings he

10 contacted his attorney and we find ourselves here today.  I

11 think in totality when you consider everything I think default

12 judgment of $4.2 million would be uncalled for unwarranted.

13 Thank you, Your Honor.

14       THE COURT: Thank you.  Who would like to be heard

15 next?

16 I will just make a couple of brief --

17       THE COURT: Is Mr. Ricci in the courtroom?  Mr. Ricci.

18 Very good.  Mr. Stevens.

19       MR. STEVENS: I just had two brief points for this

20 respondent.

21       THE COURT: Sure.

22       MR. STEVENS: The first is a statement --

23       THE COURT: Excuse me.  Let the record reflect it is

24 now 2:35 on a matter that was to be called at noon and the

25 Court has been in session pretty much that entire time.  Go

43

1    ahead.

2          MR. STEVENS: The first point I wanted to respond to

3    is that -- I'm 6'1" and I have to lower this back.  Is that the

4    fact that there's an absence of a fully developed factual

5    record.  That's an admission, Your Honor, but the record Your

6    Honor has was a clear opportunity by the parties to say

7    whatever they want to say.  It doesn't even have to be

8    believable.  It just has to be a story and I admit that.  My

9    point with respect to the response to the allegation and

10   accounts and the claims in the complaint that the issuance of

11   the release lacked fair consideration, it was a fraudulent

12   conveyance, there is absolutely no response to that.  There's

13   not even a general denial anywhere found in the papers

14   submitted by Mr. Roncati to that allegation.  Now is the chance

15   to -- it doesn't have to be a fully developed factual record.

16   There just has to be -- someone has to give Your Honor

17   something.  There should be something in these written papers

18   that let's us know you know what, I don't agree with that and

19   that wasn't there.

20         In fact, Mr. Walker is standing here today and saying

21   that he can speculate that maybe there's something but we've

22   had an opportunity here.  So of course there's not a fully

23   developed factual record.  Your Honor is not making findings of

24   fact based on the allegations in the complaint but what the

25   Court has to look at says absolutely nothing.  That's your

44

1    opportunity.  Why bother answering complaints if we can just go

2    and try them without doing -- we need to know what's in contest

3    and what's contested and that has not been contested.  That's

4    the response to that one issue.

5         The second has to do with prejudice in the

6    accumulation of interest.  I'm just going to put to the cites.

7    I had them laid out in my papers but the accumulation of

8    interest that may -- where the delay may thwart the plaintiff's

9    ability of recovery or remedy is in fact a prejudice that fits

10   under that bill in the Second Circuit criteria that's set forth

11   in New York v. Green, 420 F.3d 110 (2d Cir. 2005).  That was

12   also -- we found that in a decision by Judge Castel in Paul

13   Saleh v. Albert Francesco, 11 Civ. 438 (S.D.N.Y. Nov. 10, 2011)

14   and the bench memo is found at Docket Number 29 where Judge

15   Castel used the exact same criteria adopted in New York v.

16   Green Standard and it was the exact same thing there.  The

17   plaintiff was going to be prejudiced.  Their ultimate ability

18   to recovery was going to be thwarted because there was no sign.

19   If Mr. Roncati came in and said I have $5 million in the bank

20   that you can go against then true, there would be no prejudice

21   because we're going to be able to collect whatever can we

22   foresee as the accumulation of interest.  Nobody said anything

23   like that and in fact I think we can fairly safely assume and

24   can absolutely assume from the record and what's before the

25   Court that we're not going to be able to collect that and that

45

 1  we're going to accumulate interest we're never ever going to

 2  get paid on.

 3          THE COURT: Very good.  Does anyone else wish to be

 4  heard?  I will give you a written opinion.

 5          MR. STEVENS: Thank you, Your Honor.

 6          THE COURT: Thank you.  Thank you.  When are you

 7  coming back?  Not -- we don't know if you're coming back.

 8  You'll get a written opinion.  When are you coming back on just

 9  a regular day?

10          MR. STEVENS: We still have to get to the last --

11          THE COURT: Excuse me.  I apologize.

12          MR. STEVENS: I'll breeze through this.  I promise

13  you.

14          THE COURT: No, you don't have to breeze.

15          MR. STEVENS: I'm not promising them.  I'm promising

16  you.

17          THE COURT: I was going to say the hecklers over here

18  on the sides, ignore them.  What have we got?

19          MR. STEVENS: Third and final thing on the calendar

20  and there are -- two uncontested matters.  First the pretrial

21  conference.  The second is our motion.  Adversary proceeding

22  Messer v. Magee, Adversary Proceeding Number 11-9074.

23          THE COURT: I thought you all were just interested in

24  me making an edict of some sort which I neglected to do for

25  you.  What do we got?  I'm sorry.  You got the last ones on the

46

1  agenda.

2          MR. STEVENS: This is -- and I'll follow with a

3  motion, Your Honor.  I'll go quickly through this because Your

4  Honor has been very closely monitoring discovery since this

5  case was commenced in September 2011 and discovery has been

6  heated up since the summer.  We're also facing our fact

7  discovery cutoff of February 1st.  So we're on a pretty tight

8  time clock here to get things done.

9          THE COURT: Right.

10         MR. STEVENS: The developments -- first I'm going to

11 skip over subsection C in Exhibit B4 in going through our

12 status notes.  I'll address that in the motion.  That's amended

13 pleadings.  We do have a motion for leave to file our first

14 amended complaint today.

15         I'll skip to the motion to withdraw the reference.

16 That motion has or is to be withdrawn without prejudice by Mr.

17 Magee.  The idea being that --

18         THE COURT: Who's representing Mr. Magee?

19         MR. P. BURKE:  Your Honor, I can speak for him today.

20         THE COURT: Okay.

21         MR. P. BURKE:  We sent a letter --

22         THE COURT: Sate your name for the record.

23         MR. P. BURKE:  I beg your pardon, Your Honor.

24 Patrick Burke.  For the record, counsel to Magee children.  I'm

25 speaking today on behalf of John Magee.

47

1          We sent a letter after former counsel was relieved by

2  the Court to Judge Karas indicating to him that we would

3  withdraw the motion for -- withdraw without prejudice with the

4  Court's permission and just waiting to submit to Judge Karas an

5  order to that effect.

6          THE COURT: Okay.  Thank you.

7          MR. STEVENS: So for the time being that motion is off

8  the table subject of course to any of the defendants' rights to

9  refile.

10         Discovery is moving along at a very rapid pace.  We

11  have -- I'm going to skip through the initial disclosures.

12  Deponents and tell you exactly where we are with depositions.

13  Party depositions, Mr. Magee has now been fully deposed by our

14  side.  We deposed him over a four-day period in November and

15  December.  We have added two additional party depositions,

16  Elizabeth Keith and Jonathan Magee and deposed non party Ira

17  Shapiro.  Upcoming this week we have Mr. Roncati on Thursday,

18  Allen Feldstein on Friday.  Mr. Dorfman will be next Monday and

19  Tuesday and may continue on.  Of course Mr. Haspel reserves all

20  rights to complain about that, and then Mr. Robert Caulfied on

21  January 22nd.

22         We still have an number that we have noticed and are

23  trying to get scheduled.  Therese Magee, a party defendant, has

24  some medical issues so we're trying to accommodate those and

25  get her deposed at a time that's appropriate and we may in fact

48

 1 | be asking Your Honor for --

 2 |        THE COURT: For an extension?

 3 |        MR. STEVENS: For one limited purpose fact discovery

 4 | so that we can accommodate --

 5 |        THE COURT: I understand that but I would like to know

 6 | a little bit more about the medical condition before I would

 7 | extend it if they -- yes, sir.  Mr. Burke?

 8 |        MR. P. BURKE: Do you want to know it now, Judge?

 9 |        THE COURT: That's fine, yes.

10 |        MR. P. BURKE: She's got cancer.

11 |        THE COURT: Okay.  That will more than likely warrant

12 | an extension.

13 |        MR. STEVENS: And Jason Klein and Lorette Klein, both

14 | of which are now have retained Blank Rome who have been

15 | representing Mitchell Klein, one of the primary named

16 | defendants in this action.  They're now being represented.  We

17 | have been unsuccessful in scheduling their deposition.  Of

18 | course they had each received proper service -- excuse me.

19 | Jason Klein did not receive proper service subpoena.  We had

20 | issue serving him but there was an agreement to schedule his

21 | deposition for him to come in voluntarily.  Ms. Klein has

22 | received service of a subpoena.  It is supposed to be

23 | scheduling but we're having a few hiccups in terms of getting

24 | that done and need to obviously get it done this month.  If we

25 | have any more hiccups I may be flying in here and bothering the

49

1    Court with that issue.

2            THE COURT: I would need those that represent these to

3    be with you to tell me why the schedule was not met but not

4    just you.  Okay?

5            MR. STEVENS: Understood, Your Honor.

6            THE COURT: Thank you.

7            MR. STEVENS: Mitchell Klein, named defendant, is to

8    be scheduled. We're still conferring amongst the parties that

9    are actively litigating whether Mr. Klein will be deposed in

10   person or whether he would be deposed on written question.  The

11   reason being is he had unequivocally stated that with respect

12   to any question other than what's his name and where does he

13   live he's going to plead the Fifth.

14           THE COURT: Plead the Fifth?

15           MR. STEVENS: Yes, Your Honor.

16           THE COURT: Do we think we have a criminal prosecution

17   going on here?

18           MR. STEVENS: We do not yet but --

19           THE COURT: It might be a possibility?

20           MR. STEVENS: I think some would classify it as

21   inevitable but it's a distinct possibility.

22           THE COURT: I think this is the first time I've heard

23   that even though I don't disagree but I don't remember ever

24   hearing that there might be a criminal prosecution.

25           MR. STEVENS: We -- I recall talking about it quite a

50

1   while ago.  It's been a long time but --

2           THE COURT: Now you say that I remember.

3           MR. STEVENS: The U.S. Attorney -- and it's known to

4   everybody in the room.  The U.S. Attorney and the FBI have an

5   active and open investigation going.  They have not -- there

6   have been no indictments.  There have been no arrests but there

7   is an active ongoing investigation in this matter.

8           THE COURT: All right.

9           MR. STEVENS: So Mr. Mitchell Klein -- and he's taken

10  this position for quite some time with us which is why we never

11  deposed him under 2004 that he will be pleading the Fifth.  So

12  we're going to decide whether or not we're going to do that in

13  written question or spend time with him.

14          THE COURT: Sure.

15          MR. STEVENS: The weekly conference call is that Your

16  Honor ordered back in the fall --

17          THE COURT: Nice.

18          MR. STEVENS:  -- have been extremely effective in

19  getting the parties --

20          THE COURT: Are we continuing them?

21          MR. STEVENS: We have continued.  We've had every

22  single one.

23          THE COURT:  Congratulations. Did you all say Happy

24  New Year to each other?

25          MALE VOICE: No, he didn't.

51

1          MR. STEVENS: Your Honor's order did exempt us from

2   both -- because they're Tuesday 8:30 a.m.  So the order did

3   excuse us from the Christmas call and the New Year's call.  So

4   we haven't had one today.  We had one in the hallway and that

5   was what we previously agreed to.

6          THE COURT: Thank you very much.

7          MR. STEVENS: We've also stated that we are going to

8   discuss stipulating subject to Your Honor's approval to moving

9   those to bi-weekly once fact discovery closes.

10         THE COURT: We will let you bring it up at that time.

11         MR. STEVENS: So those have gone forward.  We have --

12  I can't say thankfully that I've actually successfully

13  produced, timely produced agendas and notes to those which I

14  was required to do under the order.  It was --

15         THE COURT: Ms. Fredericks, we're all looking at you.

16         MR. STEVENS: Pardon?

17         THE COURT: No, I'm teasing her.  Good.

18         MR. STEVENS: That was what I called Mr. Goldberg's

19  last stand was pushing that in the order and giving me some

20  extra work before he left us in his -- and no longer involved.

21         THE COURT: But it is nice to have the agenda.  It

22  does make it simpler for everybody.

23         MR. STEVENS: I agreed to it because it was

24  appropriate, yes, Your Honor.

25         THE COURT: Yes.  Thank you.

52

1          THE COURT: But I will complain about it.

2          THE COURT: Okay.

3          MR. STEVENS: Upcoming dates and deadlines just to

4   keep the Court aware, we have a February --

5          THE COURT: Yes, I saw that.

6          MR. STEVENS:  -- 1st fact discovery cutoff, a March 1st

7   deadline to meet and confer regarding what experts we're going

8   to use and subject matter of the expert testimony.  Until May

9   3rd to complete expert reports and exchange them and then June

10  28th will be the time to complete expert discovery after which

11  we should be prepared to have that final pretrial conference

12  and ready to file our motions in limine and be trial ready.

13         THE COURT: I need to do something -- you need to do

14  something for all of us and for you and for everyone else in

15  the audience.  If we have something that is extensive we need

16  to just specially set it.  Otherwise this time is good but we

17  can also hear you on Thursday or Friday.  So you all need to

18  help me with that because I do hate to keep people from their

19  employment or whatever.

20         MR. STEVENS: I apologize.  I will do that.

21         THE COURT: No, don't apologize.  It's just -- it's my

22  fault.  I do the scheduling.  I mean we do the scheduling.

23         MR. STEVENS: It's not.  Ms. Fredericks has to call me

24  and harass me for the agenda which I should be forthcoming

25  with.

53

1          MR. STEVENS: That's why I was teasing her.  You have

2     to --

3          MR. STEVENS: Please don't tease her because it is all

4     on yours truly.  Believe me.

5          THE COURT: Well, she protects me.

6          MR. STEVENS: I'm not directing the Court not to tease

7     the courtroom deputy.  I mean you can do what you want -- I

8     don't want her to hold it against me.  I'm not doing it.

9          THE COURT: But she will.  Trust me, she will and

10    she'll get mad.  Okay.  So when do you want to see me again?

11         MR. STEVENS: I believe -- well, we do have one more

12    matter.  Let me fly through it.  We have a motion for leave to

13    amend, file a first amended complaint.  The motion is

14    uncontested.  The two counts that we're seeking to add -- and I

15    streamlined it.  I streamlined.  I started the amended

16    complaint at the paragraph where we left off in the initial

17    complaint so that we're not forcing people to reanswer another

18    240 pages of --

19         THE COURT: And my understanding is that's unopposed.

20         MR. STEVENS: It is unopposed, Your Honor.

21         THE COURT: Very good.

22         MR. STEVENS: Excellent.

23         THE COURT: Submit an order and I'll allow that.

24         MR. STEVENS: I will, Your Honor.

25         THE COURT: Now, when do you want to see me again?

54

1        MR. STEVENS: The one matter was adjourned to January

2   29th.  That was the NCP matter.

3        THE COURT: But I don't think that we have to bring

4   everybody back.  It's just what's according -- what do you want

5   to do?

6        MR. STEVENS: The only thing I would want that date

7   for, and I would love to keep it with the caveat that we could

8   adjourn it if we're all on the same page and everything is

9   fine, is --

10        THE COURT: As long as you all are talking to each

11   other I will let you.

12        MR. STEVENS: If I have a discovery issue and need an

13   extension of the fact discovery cutoff -- it may not involve

14   everybody here.  It may involve just a recalcitrant third party

15   witness perhaps.

16        THE COURT: Or an ill patient.  That -- bring it by

17   then.  Bring it by January 29th so we can hear it then.  Yes,

18   sir.

19        MR. HASPEL:  Your Honor, you're going to be receiving

20   a motion with a motion to shorten time with -- addressing the

21   depositions of Mr. Dorfman.  It's prepared.  I was hoping to

22   get to the Court today but I don't think I'm going to be able

23   to do it at this point.  We're not seeking to stop the

24   deposition that's on the schedule by the Trustee.  However, in

25   the state court proceedings that are related after some time

55

1   Judge Jamison entered an order which effectively indicated that

2   based upon Mr. Magee's wrongdoings in stealing Mr. Dorfman's

3   files he's going to be precluded from certain events which I

4   don't want to go into at this point in time.

5              THE COURT: Sure.

6              MR. HASPEL: What's going to be presented to Your

7   Honor is to effectively adopt Judge Jamison's ruling for Mr.

8   Magee's conduct because it's -- what discovery was going on in

9   that case is the same as the discovery that's going on in this

10  case.

11             THE COURT: File it.  Mr. Stevens will respond.

12             MR. HASPEL: Like I said, I don't think it has

13  anything to do with Mr. Stevens.

14             THE COURT: Or Mr. Burke.  Whoever needs to --

15             MALE VOICE:  It has more to do with the Magee, Your

16  Honor.  We have been waiting for this shooted draft for months

17  and now when we're going to get the draft --

18             THE COURT: In three weeks.

19             MALE VOICE: Tuesday we're supposed to be down in Mr.

20  Stevens' office on Monday to conduct Burt Dorfman's deposition.

21  I don't think that's fair.  I don't mind responding, Mr.

22  Haspel, to what you say.

23             THE COURT: Shortening time between now and Monday?

24             MALE VOICE:  Yes. I've got no time to --

25             THE COURT: You can do it.  I won't tell you that

56

1   you'll be favorably possessed for it but I'll always look at

2   it.

3           MALE VOICE: We're not seeing to stop Mr. Stevens --

4           THE COURT: I hear you.  I hear you.

5           MALE VOICE: -- deposition from going forward.

6   That's --

7           THE COURT: I hear you.  It is Wednesday.  We'll deal

8   with it if it comes our way.

9           MR. STEVENS: Thank you, Your Honor, and your notes

10  regarding scheduling are heard and let me apologize to the

11  folks --

12          THE COURT: Yes, apologize to everybody.  Thank you.

13  I don't -- we don't mind but it's really tough on people that

14  have to be out of work.

15          MR. STEVENS: I understand, Your Honor.

16          THE COURT: Back on January 29th.

17          MR. STEVENS: At noon.

18          THE COURT: Thank you.

19                       * * * * *

20

21

22

23

24

25

57

1       I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                   _____

6                                           Shari Riemer

7   Dated:  April 15, 2013